STATE

v.

Thomas GATONE.

No. 96–124–C.A.

Supreme Court of Rhode Island.

July 25, 1997.

Andrea J. Mendes, Aaron L. Weisman, Providence, for Plaintiff.

James T. McCormick, Providence, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, and FLANDERS, JJ.

## OPINION

WEISBERGER, Chief Justice.

This case comes before us on appeal by the defendant, Thomas Gatone, from a judgment of conviction entered after a jury trial in Superior Court of two counts of robbery in the first degree, two counts of conspiracy to commit robbery, and two counts of illegal possession of a firearm by one previously convicted of a crime of violence. The defendant was sentenced to fifty years' imprisonment for each count of first-degree robbery and ten years' imprisonment for each count of conspiracy to commit robbery and illegal possession of a firearm. The trial justice adjudged the defendant a habitual offender and sentenced him to an additional twenty years' imprisonment, the first eight years to be served without the benefit of parole. All sentences are to run concurrently. In support of his appeal the defendant raises several issues. We sustain the appeal in part and remand the case to the Superior Court for a new trial. The facts of the case insofar as pertinent to this appeal are as follows.

At approximately 9:25 p.m. on December 9, 1994, William Loynds (Loynds) was working as a clerk at a Cumberland Farms store in Pawtucket, Rhode Island, when a man he later identified as defendant, entered the store, held out a gun, and demanded the store's money. Loynds was slow to respond, prompting defendant to exclaim that he "wasn't [expletive] joking." He repeatedly demanded that Loynds "hurry-up" and threatened, "I wouldn't have a problem shooting you." After putting cash from the register in a bag, Loynds asked defendant if he wanted the store's food stamps and loose change. The defendant took the stamps but not the change. He then inspected the register for hidden twenties. Before leaving the store, defendant demanded Loynds's money, but Loynds responded that he only had a quarter. Loynds then watched him leave the store. He heard defendant shout, "Let's go," and saw a silver Cadillac with license plate No. MP–588 approach him. The vehicle's passenger-side door swung open, and defendant entered. Loynds telephoned 911, and the police soon arrived at the store. Loynds described the assailant to police as a Caucasian male with a medium complexion, medium to small build, weighing under 170 pounds, approximately five feet seven inches in height, and in need of a shave. He told police that the gunman was wearing tinted

sunglasses, a light brown toque hat with matching knit gloves, and a winter jacket. He described the gun used in the robbery as an automatic weapon, silver in color with a rounded barrel. Approximately one week later Loynds identified defendant from a photo array as the person who had robbed him. At trial Loynds testified that the gunman stood approximately two or three feet from him during the course of the robbery and that the store was brightly lit. Loynds also testified that he was certain it was defendant who had committed the robbery.

Maria Louise Pacheco (Pacheco) also testified at trial. She stated that on December 9, 1994, her Cadillac was stolen from a parking lot in Seekonk, Massachusetts. That Cadillac was spotted by a state witness one-tenth of a mile from the Cumberland Farms store sometime after nine o'clock on the evening of the robbery. The witness testified that she was looking outside her front window when a car with its headlights off pulled up across the street. Two men left the car, entered a van nearby, and drove away. The witness became suspicious when the men left the vehicle's windshield wipers on and the driver-side window down despite the driving rain. After no one came back for the car, the witness's husband telephoned police. At trial the witness identified Pacheco's Cadillac as the car that had been abandoned.

Another state witness, Richela Woolley (Woolley), testified that on December 10, 1994, the day following the Cumberland Farms robbery, she, defendant, and Ronald Walsh were at her apartment, getting high on cocaine. According to Woolley, after the cocaine was gone, the three began "scheming" about how to finance their next cocaine purchase. Following a short discussion Woolley and Walsh went to Chalkstone Avenue to "case" a store called "Baskets by Corrie." Sometime thereafter they returned to Woolley's apartment. Walsh then indicated to defendant that it was time to go, and the two men left the apartment and returned approximately twenty-five minutes later with a pocketbook. The men exclaimed that they "didn't get a [expletive] thing." Woolley then left the apartment to purchase more cocaine but was stopped by police, who asked

her questions concerning two men driving a burgundy van. Woolley returned to the apartment to inform defendant and Walsh that the police were looking for them. In response the two men fled.

The owner of the basket shop, Corrine Gibalerio (Gibalerio), also testified at trial. She stated that on December 10, 1994, a woman later identified as Richela Woolley entered her shop with a short, heavy-set man. She became suspicious of the duo when she recognized Woolley as the person who had allegedly stolen $1,500 from her shop on a previous occasion. After a short time, however, Woolley and her companion left. Gibalerio testified that approximately thirty minutes later a man wearing a baseball cap and carrying a gun burst into her shop, shouting, "I'm not [expletive] fooling around." He pushed her to the floor, pointed a gun at her face, grabbed an employee's handbag that was lying on the floor, and fled. Gibalerio described the gunman as a Caucasian male with a slight build, five feet five or five feet six inches tall, and clean cut.

Four days later, police showed Gibalerio a photographic array that included a photograph of defendant, but she testified that she was unable to identify him. On January 11, 1995, Gibalerio viewed several men in a physical lineup at the Providence police station. The defendant was among the several men present in the lineup. Gibalerio failed to identify him positively. At trial Gibalerio testified that she had difficulty concentrating during the lineup because during the procedure one individual in the lineup was "making all kinds of distorted features." An officer present during the lineup corroborated Gibalerio's testimony and stated that he "had to knock on the glass because one of the individuals wouldn't look straight ahead." Gibalerio testified that after viewing the lineup she saw defendant's photograph in the *Providence Journal–Bulletin* newspaper affixed to an article concerning the robbery of her store. Gibalerio testified that upon seeing the photograph, she immediately recognized defendant as the man who had robbed her. She testified that she never read the article dated January 13, 1995, but clipped it from the paper with that intention. Subse-

quently Gibalerio testified before a grand jury and positively identified defendant from a photographic array as the man who had robbed her on December 10, 1994.

Another state witness, Sergeant Steve Bathgate of the Providence Police Department, also testified at trial. He stated that on December 13, 1994, he and another police officer followed a red van in an unmarked police car through the streets of Providence. He testified that he recognized defendant as the driver of the van and Ronald Walsh as the passenger. When both the van and the unmarked police car were stopped, Officer Bathgate held out his police badge and began to leave his vehicle. In response defendant put the van in reverse and a car chase ensued. During the chase some small plastic bags and a silver object were thrown from the passenger-side window of the van. These objects were later recovered by Detective Phillip Harnett and were identified as a silver handgun and three small plastic bags of a white substance later determined to be cocaine. After the van came to a stop, the police chased both defendant and Walsh on foot. The police apprehended Walsh during the pursuit, but defendant was not arrested until sometime later. Other items seized from the van included an orange and green baseball cap, a black toque hat, sunglasses, and a plastic bag containing a white powdery substance.

Relying on this information and other evidence, the jury found defendant guilty of robbery in the first degree, conspiracy to commit robbery, and illegal possession of a firearm by one previously convicted of a crime of violence.[1] Following the verdict defendant filed a motion for a new trial, which the trial justice denied. On January 11, 1996, defendant filed a notice of appeal to this court. In support of his appeal defendant raises several issues. Additional facts will be furnished as required to discuss these issues.

I

Motion to Suppress Loynds's In- and Out-of-Court Identifications

The defendant claims that the trial justice erred by denying his motion to suppress

Loynds's in- and out-of-court identifications of him. He argues that Loynds's out-of-court identification was achieved by the use of an unnecessarily suggestive photographic array and his in-court identification lacked independent reliability. The defendant also argues that Loynds did not have sufficient opportunity to view the perpetrator of the robbery and therefore lacked personal knowledge of the matter as required by Rule 602 of the Rhode Island Rules of Evidence.

When the decision of a trial justice on a motion to suppress is under review, "the duty of the reviewing court is to view the evidence in the light most favorable to the government and apply the 'clearly erroneous' rule." *State v. Gomes*, 604 A.2d 1249, 1253 (R.I. 1992) (quoting *State v. Beaumier*, 480 A.2d 1367, 1375 (R.I.1984)). Viewing the evidence in the light most favorable to the state, we find that the trial justice did not err in denying defendant's motion to suppress Loynds's in- and out-of-court identifications.

■■■ In determining the admissibility of Loynds's out-of-court identification, this court must first consider whether the photographic array used by the police was unnecessarily suggestive. *State v. Gardiner*, 636 A.2d 710, 715 (R.I.1994); *State v. Camirand*, 572 A.2d 290, 293 (R.I.1990). "[C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside * * * only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253 (1968); *State v. Andrade*, 544 A.2d 1140, 1145 (R.I.1988). In determining whether the photographic array poses a substantial risk of misidentification, we must "compare the physical characteristics of each individual featured in the display to the general description of the suspect given to the police by the victim." *State v. Barnes*, 559 A.2d 136, 140 (R.I.1989). If we conclude that the array was unnecessarily suggestive, we

---

1. The defendant and his codefendant, Ronald Walsh, were tried jointly.

must then consider whether "in the totality of circumstances" Loynds's out-of-court identification of defendant was nonetheless reliable. *Id.* at 140 (citing *Manson v. Brathwaite*, 432 U.S. 98, 113, 97 S.Ct. 2243, 2252, 53 L.Ed.2d 140, 153 (1977)). If we find that the out-of-court identification is not impermissibly suggestive, then the in-court identification is likewise proper. *Gardiner*, 636 A.2d at 716; *State v. Mastracchio*, 612 A.2d 698, 706 (R.I.1992). At the pretrial hearing for the motion to suppress, defense counsel claimed that the photographic array was unduly suggestive because defendant's photograph was the only one that depicted an older, darker skinned man. The trial justice, however, rejected this argument. He found the photographic array "very fair," specifically noting that nothing in the array or in the manner in which it was shown to Loynds directed his attention to the photograph of defendant. We agree. This court has previously stated that the subjects of a photographic array need not be "look-alikes," as "long as they possess the same general characteristics." *Barnes*, 559 A.2d at 140. In the instant case Loynds described the perpetrator to police as a Caucasian male in his thirties with a medium complexion, medium to small build, weighing under 170 pounds, approximately five feet seven inches in height, and in need of a shave. The trial justice noted that all the individuals in the array appeared clean cut and were Caucasian males with similar hair length. The photographic array is part of the record. This court has independently examined it and the testimony concerning the conduct of the police during the presentation of the array to the witness. We find all the individuals depicted therein to be Caucasian males who at least appear to be similar in age and possess similar physical characteristics. The record is bereft of evidence that the police in any way influenced Loynds's selection of defendant's photograph.

█ In any event we conclude that Loynds's identification of defendant is independently reliable. The factors to be considered when determining the independent reliability of an identification are the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382–83, 34 L.Ed.2d 401, 411 (1972); *Camirand*, 572 A.2d at 294 (citing *Manson*, 432 U.S. at 114, 97 S.Ct. at 2253, 53 L.Ed.2d at 154). Applying these factors to the present case, we find that the record reveals that Loynds had a sufficient opportunity to view the gunman, gave a detailed description of him to police, and even noted that the perpetrator was left-handed, as is defendant. Six days after the robbery Loynds identified defendant and stated with certainty that it was defendant who had robbed him.

█ Alternatively, defendant argues that Loynds lacked personal knowledge of the matter as required by Rule 602 of the Rhode Island Rules of Evidence. Rule 602 provides in pertinent part:

> "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself or herself."

A witness's testimony is inadmissible under Rule 602 only if the trial justice finds that the witness could not have actually perceived or observed that to which he or she purports to testify. *State v. Ranieri*, 586 A.2d 1094, 1098 (R.I.1991). The trial justice has broad discretion in determining the competency of a witness under Rule 602, and his or her ruling on the issue will not be disturbed on appeal absent a clear abuse of discretion. *State v. McDowell*, 685 A.2d 252, 255 (R.I. 1996); *Ranieri*, 586 A.2d at 1098–99. In the instant case the trial justice concluded that Loynds had a sufficient opportunity to observe defendant personally during the robbery. We agree. Loynds testified that the gunman stood between two and three feet from him during the course of the robbery and that the store was brightly lit. He testified that he looked directly into the gunman's face, engaged him in conversation, and

watched him leave the store. Thus the personal-knowledge requirement of Rule 602 was met, and Loynds's testimony was properly admitted.

## II

### Chance Encounter

In a related claim defendant argues that Loynds's in-court identification of him was tainted because of the cumulative impact of the suggestive photographic array and the courthouse encounter that occurred between him and Loynds during the suppression hearing. Because we have already concluded that the photographic array was not suggestive, we shall limit our analysis to the courthouse confrontation.

Apparently during the suppression hearing held on September 7, 1995, defendant was brought to the courtroom at a time when Loynds was present in the corridor. The following day defendant brought the encounter to the attention of the trial justice, stating that it was "a mistake" to have had him escorted to the courtroom "in front of" Loynds. Defense counsel then explained to the trial justice that while she, the prosecutor, and the trial justice were in conference, defendant passed Loynds in the hallway on his way into the courtroom. The prosecutor claimed that he was unaware of the alleged confrontation but was curious how defendant knew it was Loynds he had passed in the corridor and not some other individual.

In response, the trial justice noted that defense counsel's request to sequester defendant was not made until the conference was underway and that as soon as practicable marshals escorted defendant back downstairs. After considering defendant's concerns, the trial justice stated that the "chance encounter" did not alter his determination that Loynds's identification of him was admissible.

 On appeal defendant contends that the trial justice erred by not questioning Loynds and the police officer involved for the purpose of determining whether the encounter was accidental or contrived.[2] However defendant did not request such an examina-

tion, nor did he contend that the encounter was orchestrated by improper state conduct. Further, he failed to move to suppress the identification on this basis. In fact the record suggests that all the parties involved, including defendant, viewed the incident as mere happenstance. It is well settled that an accidental encounter between a witness and a defendant that is not contrived by the police or the prosecution will not mandate suppression of the witness's subsequent in-court identification. *State v. Bertram*, 591 A.2d 14, 26–27 (R.I.1991); *State v. Pailin*, 576 A.2d 1384, 1389 (R.I.1990); *State v. Manocchio*, 497 A.2d 1, 11 (R.I.1985). This is especially true when clear and convincing evidence exists that the in-court identification was based upon sufficient independent recollection of the event. *State v. Porraro*, 121 R.I. 882, 886, 404 A.2d 465, 468 (1979) (in-court identification admissible if witness's recollection is independent of flawed out-of-court identification); *accord State v. DeMasi*, 118 R.I. 494, 498, 374 A.2d 806, 808–09 (1977).

 The record in this instance indicates that Loynds spontaneously observed defendant while waiting in a corridor filled with people, and not a scintilla of evidence exists to suggest that the actions of the police or of the prosecution impermissibly influenced Loynds's identifications. *See, e.g., Bertram*, 591 A.2d at 25–26; *Pailin*, 576 A.2d at 1389; *Manocchio*, 497 A.2d at 11. On the contrary, Loynds initially identified defendant from a fairly constituted photographic array six days after the robbery and approximately nine months before the corridor confrontation. Further, we have previously concluded that Loynds's identification of defendant clearly rests on a basis independent of any allegedly improper state conduct. Accordingly, we conclude that the trial justice did not err in denying defendant's motion to suppress Loynds's in-court identification.

## III

### Motion to Suppress Gibalerio's In- and Out-of-Court Identifications of Defendant

 The defendant claims that Gibalerio's identifications of him should have been

---

2. In this regard we note that the trial justice heard from defendant, defense counsel, and the

prosecutor in determining how the encounter came to pass.

excluded under Rule 602 because she did not have sufficient opportunity to view the man who robbed her. He asserts that Gibalerio's identification of him was a direct result of her exposure to his photograph in the *Providence Journal–Bulletin* newspaper and the accompanying article that said that he and another man had been arrested for the robbery. The trial justice, however, found Gibalerio's identification of defendant to be independent of any exposure she may have had to the newspaper photograph. Gibalerio's testimony arguably revealed that she had viewed the *Providence Journal–Bulletin* photograph sometime after she failed to identify defendant in a photographic array and a physical lineup but before she identified him from a photographic array at the grand jury hearing. In *Gomes,* this court held that a motion to suppress a witness's identification testimony should not be granted on the basis of private actions such as a witness's exposure to newspaper articles, photographs, or group discussions. 604 A.2d at 1254. Similarly in *State v. Pailon,* 590 A.2d 858 (R.I. 1991), this court refused to suppress the identification testimony of a witness simply because she was told by another individual that Pailon was the perpetrator of the crime. In that case, like the present one, the victim failed to identify the defendant from a photographic array as the person who had robbed her but was able to give a general description of the perpetrator to police. *Id.* at 859. A man later contacted the victim and informed her that it was Pailon and a second man who had committed the crime. *Id.* at 860. He showed the victim a photograph. *Id.* Upon viewing the photograph, the victim instantly recognized the person who had assaulted and robbed her. *Id.* Approximately four months later the victim identified Pailon from a lineup. *Id.* In upholding the admissibility of the victim's identification, this court held that the exclusionary rule "is not triggered by the actions of private persons however egregious they may be." *Id.* at 861 (citing *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984)). We held that in such a situation the defendant's due-process rights are best protected by the opportunity given to defense counsel to cross-examine the

witness for the purpose of testing his or her credibility before the jury. 590 A.2d at 863.

In the present case there was no evidence to suggest that the actions of the police or the prosecution caused Gibalerio to be exposed to the newspaper photograph of defendant. Quite to the contrary, Gibalerio testified that she received the *Providence Journal–Bulletin* at her store, came across defendant's photograph herself, and instantly recognized the person depicted therein as the man who had robbed her. During the motion to suppress, defense counsel herself acknowledged that up until and including the moment when Gibalerio viewed the *Providence Journal–Bulletin* photograph, "no police action" had taken place. Instead she merely speculated that the state may have acted improperly in obtaining Gibalerio's grand-jury-identification testimony.

■ The defendant, on appeal, argues that the state had the burden of proving that the police did not bring about the publication of defendant's photograph in the *Providence Journal–Bulletin* in anticipation of the fact that Gibalerio would read it. We disagree. Once the state introduced Gibalerio's testimony that indicated that there was no improper overreaching on its part, defendant was required to challenge that inference with more than mere speculation. *See, e.g., State v. Gabriau,* 696 A.2d 290, 294–95 (R.I.1997). The defendant failed to present any such evidence, and the trial justice correctly concluded that there was no improper state action. As such, Gibalerio's mere exposure to the photograph did not require the exclusion of her identification testimony on due-process grounds. *See Pailon,* 590 A.2d at 863.

■ Nonetheless, we recognize that "identification evidence might become so unreliable as to fall below the threshold of competence." *Id.* Such a situation is rare and would require a finding by the trial justice, or by this court on appeal, that the witness could not have actually perceived or observed the perpetrator. *See, e.g., Ranieri,* 586 A.2d at 1098; *Pailon,* 590 A.2d at 860. A trial justice's ruling in this regard will be reversed only for an abuse of discretion. *McDowell,* 685 A.2d at 255.

In the present case the trial justice stated that he was "absolutely convinced" that Gibalerio had an independent recollection of her assailant. The record revealed that the robbery took place during the day and that Gibalerio confronted the perpetrator up close for at least three to four seconds. She described the gunman as a young Caucasian male with a slight build, five feet five to five feet six inches tall, and clean cut. The fact that Gibalerio testified that the perpetrator's eyes appeared blue when the defendant's eyes were brown or that she failed to identify defendant in the first photo array or a subsequent physical lineup does not mean that she did not have sufficient opportunity to perceive the perpetrator.

The defendant's reliance on this court's decision in *Ranieri* does not alter our analysis. The elderly witness in *Ranieri* maintained for eighteen months that she could not identify her attacker. 586 A.2d at 1099. The assault in that case took place at four o'clock in the morning, and testimony suggested that there was no light on during the attack. *Id.* at 1096. This court also excluded the neighbor's identification in that case because a full-face identification of the defendant was made despite the witness's admission that he viewed the assailant's upper lip only. *Id.* at 1100–01. Unlike the victim in *Ranieri*, Gibalerio had sufficient opportunity under favorable conditions to observe her assailant's entire face. This court has never held that Rule 602 "require[s] that the witness' knowledge be positive or rise to the level of absolute certainty," *Ranieri*, 586 A.2d at 1098 (quoting *M.B.A.F.B. Federal Credit Union v. Cumis Insurance Society, Inc.*, 681 F.2d 930, 932 (4th Cir.1982)), nor is it the function of the trial justice to determine whether the witness is "accurately and truthfully relating that which he [or she] perceived." *Ranieri*, 586 A.2d at 1098. Those matters are properly raised by defense counsel during cross-examination of the witness for the purpose of undermining the witness's credibility. *See Pailon*, 590 A.2d at 863. We have specifically held that when "the question of a witness's Rule 602 competency is close (that is, the jury could find that the witness perceived the matter testified to), the judge should admit the testimony since the matter then becomes one of credibility and is properly for the jury." *Ranieri*, 586 A.2d at 1098. The trial justice did not therefore abuse his discretion in denying defendant's motion to suppress Gibalerio's testimony.

## IV

### Motion for a Continuance

The defendant also contends that the trial justice erred in denying his motion for a continuance. Defense counsel requested a continuance on the first day of trial for the purpose of obtaining transcripts concerning the motions to suppress the identifications of Loynds and Gibalerio. Separate counsel had represented defendant during the suppression hearings. The trial justice denied the request, noting that defense counsel had been assigned to the case a month earlier but had failed to order the transcripts. The defendant contends on appeal that these transcripts were essential to his cross-examination of the witnesses and prevented him from preparing and presenting a proper defense. We find this contention without merit.

Ordinarily a motion for a continuance is addressed to the sound discretion of the trial justice, and his or her decision will not be overturned on appeal absent an abuse of discretion. *State v. Lanigan*, 528 A.2d 310, 316 (R.I.1987). Nonetheless, there may be occasions when a request for a continuance should be honored in order to protect the accused's Sixth Amendment right to present favorable evidence necessary for a full defense. *State v. Dionne*, 442 A.2d 876, 882 (R.I.1982); *State v. Levitt*, 118 R.I. 32, 41, 371 A.2d 596, 601 (1977). "In reviewing the denial of a motion for a continuance, we shall look to the circumstances of each case to determine whether or not an abuse of discretion has taken place." *State v. Ucero*, 450 A.2d 809, 814 (R.I.1982).

In the context of this case we are of the opinion that the trial justice's denial of the motion for a continuance did not constitute an abuse of discretion. The record reveals that defense counsel did not exercise

due diligence in attempting to secure the transcripts despite being assigned to the case for over a month. Further, any prejudice that may have resulted from the unavailability of the transcripts has since become moot. The defendant has long ago obtained the transcripts of the suppression hearing, which materials will be available to him in the second trial.

## V

### Right to Self–Representation

In his next assignment of error defendant contends that the trial justice effectively denied him his Sixth Amendment right to represent himself. The record in this respect reveals that during the cross-examination of a state witness defense counsel informed the trial justice that defendant wished to act as co-counsel and question the witness himself. In response the trial justice stated, "I will not permit [defendant] at this point to interject himself * * * so that he can act as his own counsel in the middle of trial." After the witnesses were excused from the stand and the jury excused from the courtroom, the trial justice permitted defense counsel to explain defendant's request, whereupon the following exchange took place:

"[Defense Counsel]: Your Honor, during Detective Johnston's testimony, my client wanted to question the witness and to act as co-counsel, and I brought this to the Court's attention at side bar. * * * I did indicate that I didn't think it was in his best interest to do that, but * * * that's why I brought it to the Court's attention.

"The Court: Look, Mr. Gatone, you have had three lawyers representing you in this case.

"[Defendant]: Two lawyers.

"The Court: Three. * * * I don't know what's on your mind, sir, with regard to matters that happen during the trial. If there are areas that you think your lawyer should inquire into, you tell your lawyer. You have a good lawyer. Frankly, you've had three good lawyers. Mr. Wiley is your lawyer. He's representing you in able fashion. If there are things that you think he needs to follow up on, all you need

do is tell him quietly in the corner there as you're sitting with him. Is that agreed?

"[Defendant]: Well, your Honor, I mean—I agree on the situation that Mr. Wiley probably is a good lawyer, but the way he has been setting himself, I could do a better job. That's why I want to co-counsel. I could do a better job than him.

"The Court: Well, you're not going to be co-counsel in this case. You have counsel.

"[Defendant]: Your Honor, I can't be a co-counsel?

"The Court: No.

"[Defendant]: All right.

"The Court: Nor will I permit you to represent yourself if you fire Mr. Wiley during this trial, if that's on your mind."

On appeal defendant contends that the trial justice's refusal to allow him to represent himself constituted reversible error. We agree.

In *Faretta v. California*, 422 U.S. 806, 807, 95 S.Ct. 2525, 2527, 45 L.Ed.2d 562, 566 (1975), the United States Supreme Court held that a defendant has a Sixth Amendment constitutional right to represent himself or herself in a criminal trial. *See also State v. Kennedy*, 586 A.2d 1089, 1091–92 (R.I. 1991). This right is made applicable to the states through the Fourteenth Amendment to the United States Constitution and forbids a state court from forcing appointed counsel upon a defendant against his or her will. *Faretta*, 422 U.S. at 807, 95 S.Ct. at 2527, 45 L.Ed.2d at 566. In *Faretta* the defendant unequivocally requested to represent himself before trial commenced. *Id.* at 835, 95 S.Ct. at 2541, 45 L.Ed.2d at 582. An inquiry by the trial justice demonstrated that Faretta was literate, competent, and understanding, and that he voluntarily waived his right to assistance of counsel. *Id.* The trial justice warned defendant that it was a mistake not to accept the assistance of counsel and that he would be required to follow the rules of trial procedure. *Id.* at 835–36, 95 S.Ct. at 2541, 45 L.Ed.2d at 582. After initially accepting defendant's waiver, the trial justice subsequently required that Faretta's defense be conducted only through his court-appointed lawyer. *Id.* at 808–811, 95 S.Ct. at 2528–

29, 45 L.Ed.2d at 567–68. In forcing Faretta to accept against his will a state-appointed public defender, the Court held that the trial justice had deprived him of his constitutional right to conduct his own defense. *Id.* at 836, 95 S.Ct. at 2541, 45 L.Ed.2d at 582.

 The state would have us distinguish *Faretta* from the present facts on the basis that defendant never unequivocally requested permission to represent himself but merely asked the trial justice if he could function as co-counsel. The state argues that defendant has no constitutional right to act as co-counsel, and thus that the trial justice did not violate the dictates of *Faretta* in denying his request. *See, e.g, Cross v. United States,* 893 F.2d 1287, 1291–92 (11th Cir.1990); *State v. Brown,* 549 A.2d 1373, 1379 (R.I.1988). We disagree. In our opinion the comments of the trial justice categorically silenced further inquiry by defendant and rendered futile any future attempt by him to request self-representation. And although defendant "may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.'" *Faretta,* 422 U.S. at 834, 95 S.Ct. at 2541, 45 L.Ed.2d at 581 (quoting *Illinois v. Allen,* 397 U.S. 337, 350–51, 90 S.Ct. 1057, 1064, 25 L.Ed.2d 353, 363 (1970) (Brennan, J., concurring)). In wresting from defendant his constitutional right to represent himself, the trial justice committed reversible error. *See McKaskle v. Wiggins,* 465 U.S. 168, 177 n. 8, 104 S.Ct. 944, 950 n. 8, 79 L.Ed.2d 122, 133 n. 8 (1984) (denial of the right to self-representation is never "harmless error").

## VI

### Judgment of Acquittal

 At the close of the evidence defendant moved for judgment of acquittal under Rule 29 of the Superior Court Rules of Criminal Procedure on the charge of conspiracy to commit robbery on December 9, 1994. The trial justice reviewed the record and indicated to defense counsel that sufficient evidence existed to submit the charge to the jury. Defense counsel conceded that in regard to this charge a motion for judgment of acquit-

tal was not appropriate. On appeal defendant asserts that there was no evidence of any agreement between him and the driver of the "getaway vehicle" to rob the Cumberland Farms convenience store. Hence he asserts that the trial justice should have granted his motion for judgment of acquittal. In these circumstances we are of the opinion that defendant has waived his right to challenge the propriety of the trial justice's ruling. Even if we assume, however, that the issue has not been waived, sufficient evidence existed to support the jury's verdict.

 When considering a motion for a judgment of acquittal, the trial justice must view the evidence in the light most favorable to the state, without weighing the evidence or assessing the credibility of the witnesses, and draw all reasonable inferences that are consistent with the guilt of the accused. *State v. Williams,* 656 A.2d 975, 977 (R.I. 1995); *State v. Lamoureux,* 573 A.2d 1176, 1181 (R.I.1990). Unless the evidence viewed in such a light is insufficient to warrant a jury verdict of guilt beyond a reasonable doubt, the motion must be denied. *Williams,* 656 A.2d at 977. In reviewing the denial of such a motion, this court must apply the same standard as the trial justice. *State v. Smith,* 662 A.2d 1171, 1176–77 (R.I.1995); *Williams,* 656 A.2d at 977.

The defendant contends that there exists no evidence of a conspiracy. "Conspiracy is defined as 'a combination of two or more persons to commit an unlawful act or to perform a lawful act for an unlawful purpose.'" *State v. LaRoche,* 683 A.2d 989, 996 (R.I.1996) (quoting *Smith,* 662 A.2d at 1177). "The agreement itself constitutes the crime, and the conspiracy is committed at the moment the agreement is struck." *LaRoche,* 683 A.2d at 996. We have held that because the complete and detailed particulars of a conspiracy may not be susceptible of direct proof, "the goals of the conspirators 'may be inferentially established by proof of the relations, conduct, circumstances, and actions of the parties.'" *Smith,* 662 A.2d at 1177 (quoting *State v. Gordon,* 508 A.2d 1339, 1349 (R.I.1986)); *State v. Mastracchio,* 612 A.2d 698, 706 (R.I.1992).

■ In the instant case Loynds testified that on December 9, 1994, at approximately 9:25 p.m., defendant entered the Cumberland Farms store with a gun and demanded the store's money. The defendant left the store with a bag of cash and shouted "Let's go," in the direction of a silver Cadillac with license plate No. MP–588. That vehicle had been idling in the store's parking lot. As defendant approached the vehicle, the passenger-side door swung open. The defendant climbed into the front-passenger-side seat of the vehicle. Pacheco testified that on December 9, 1994, her Cadillac with license plate No. MP–588 was stolen from a parking lot in Seekonk, Massachusetts. That Cadillac was spotted by a witness sometime after nine o'clock on the evening of the robbery. That witness testified that the car approached with its headlights off and pulled up across the street. Two men exited the car, entered a van nearby, and drove away. These men left the Cadillac's windshield wipers on and the driver-side window down despite heavy rain.

Considering these circumstances in a light most favorable to the state, we conclude that ample evidence existed for a jury to have found that defendant and the driver of the silver Cadillac conspired to rob the Cumberland Farms convenience store, using a stolen vehicle and later abandoning that vehicle when the crime was complete. Although there was no direct evidence of an express agreement between defendant and his co-conspirator, sufficient circumstantial evidence existed to establish guilt beyond a reasonable doubt. *Smith*, 662 A.2d at 1177. The trial justice therefore properly denied defendant's motion for judgment of acquittal.

## VII

### Prosecutor's Closing Remarks

■ The defendant also claims prejudice as a result of improper remarks made by the prosecutor during closing arguments. However, defense counsel did not object to these remarks, nor did he move for a mistrial on this basis. "It is well established that 'this court will not consider an issue raised for the first time on appeal that was not properly presented before the trial court.'" *State v. Rivera*, 640 A.2d 524, 526–27 (R.I.1994). Because defendant did not request cautionary instructions from the trial justice or any other remedial action, he is precluded from arguing this issue on appeal. *See id.* Although this court has recognized certain exceptions to the raise-or-waive rule, these exceptions do not apply to the present case.

■ The defendant does not claim that the narrow exceptions of the raise-or-waive rule are applicable. Rather he asserts that defense counsel failed to appreciate the impropriety of the prosecutor's statements and thus provided him with ineffective assistance of counsel. This court has held, however, that we shall not consider ineffective-assistance-of-counsel claims on direct appeal; such claims are more appropriately raised on a motion for postconviction relief filed under chapter 9.1 of title 10. *State v. Malstrom*, 672 A.2d 448, 450 (R.I.1996).

## VIII

### Motion for a New Trial

The defendant's final claim on appeal is that the trial justice erred by denying his motion for a new trial. However, we need not reach this issue in light of our decision to remand the case to the Superior Court for a new trial on the basis of the trial justice's refusal to allow the defendant to represent himself.

For the reasons stated, the defendant's appeal is sustained in part and denied in part. The judgment entered in the Superior Court is vacated. The papers in the case may be remanded to the Superior Court for a new trial.

GOLDBERG, J., not participating.