STATE

v.

**David GORDON.**

No. 2004–148–C.A.

Supreme Court of Rhode Island.

Sept. 1, 2005.

---

Virginia M. McGinn, Providence, for Plaintiff.

Susan B. Iannitelli, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

ROBINSON, Justice.

A jury found defendant, David Gordon, guilty of first-degree arson, conspiracy, and insurance fraud in connection with a fire that destroyed the home of Lorraine L. Holman in Foster on June 5, 1996.[1] The trial justice denied the motion for a new trial.[2] On December 6, 2002, Gordon was sentenced to serve an eighty-year term of imprisonment on the first-degree arson conviction, forty years of which were to be suspended, with probation. He was also sentenced to serve concurrent sentences of ten years of imprisonment on the conspiracy conviction and one year of imprisonment on the insurance fraud conviction.

Gordon has appealed to this Court, contending that the trial justice committed reversible error: (1) by affording him what he alleges to have been insufficient time to prepare his case and insufficient access to discovery materials once the court had decided to direct him to proceed to trial *pro se*;[3] (2) by refusing to allow private counsel to enter an appearance on his behalf after the trial began; (3) in qualifying a particular prosecution witness as an expert; (4) in failing to provide him with additional financial resources in connection with his defense; and (5) in permitting the prosecution to cross-examine him in an allegedly unlimited manner.[4] After reviewing the record and defendant's legal arguments, we discern no reversible error, and we affirm the judgment of conviction.

## I

### Facts and Travel[5]

In November of 1995, Lorraine Holman, a school bus driver, lived alone at 7 Maple Rock Road in Foster, having been divorced from her husband of almost thirty-

---

1. The jury found defendant not guilty of two additional charges: assault with a dangerous weapon and simple assault.

2. Although the filing was actually entitled as a "notice of appeal," the trial justice treated it as a motion for a new trial.

3. Although the trial justice did direct Gordon to proceed *pro se*, he simultaneously provided him with standby counsel.

4. In addition, defendant initially challenged his multiple convictions for criminal contempt; but the record reveals that this issue has now been resolved, and therefore it need not be addressed by us.

5. We summarize the most pertinent background facts in this section of the opinion; and, as we proceed to discuss defendant's appellate contentions in the analysis section, additional facts will be provided where necessary.

three years. According to Holman's testimony she was, as of that time, a law-abiding citizen.

Holman testified that she regularly attended services at Saint Paul's Church in Foster and that one day she saw an announcement in the church bulletin indicating that an inmate at the Adult Correctional Institutions (ACI) was seeking a pen pal. She further testified that she became interested in responding because she hoped that perhaps she "could make a bad person good * * *." Holman contacted a priest affiliated with the church and inquired about the announcement in the bulletin. She testified that the priest advised her to provide as little personal information as possible in her letters to the inmate and to use the church's address to receive mail from him. Holman then began corresponding by mail with the inmate (viz., defendant Gordon), using her confirmation name of Theresa as a sort of alias.

Holman further testified that, in his letters to her, Gordon began to pressure her to let her guard down. She went on to testify that she eventually gave in to that pressure by revealing who she was and where she lived. She testified that she later began visiting Gordon at the ACI on a regular basis and that he made her "feel like a special person."

She further testified that Gordon started to question her and that his questioning proceeded "slowly at first * * *." She said that he asked her about "how [she] lived, where [she] lived, what [her] home was like." She added that the questioning "increased as the visits went on."

Holman also testified that, when Gordon learned that she owned her own home and that it was insured, he would make what she called "wisecracks" such as the following: "Bet you've got a lot of money, bet you've got a pretty big savings account." She also testified that on one occasion he told her: "A house like that should be burned down to the ground." She added that she had shrugged that remark off as a joke.

Holman told the jury that Gordon then began to pressure her to take out a home equity loan so that the two of them could "buy a business, run a business, start that way." After Holman succeeded in securing a loan commitment for $25,000, she had a change of heart and told Gordon that she couldn't go through with the loan. She testified that Gordon responded by becoming "very verbally vicious * * *." Although defendant's verbal tirade caused Holman to become upset and frightened, she testified that she nonetheless continued to visit him at the ACI and that, on April 10, 1996, the day that defendant was released from prison, she gave him a gift of $25,000 towards the purchase of a business.

Holman testified that defendant told her that he was interested in buying a variety store in Woonsocket; but that (according to him) "more money was needed for the business." She further testified: "That's when the talk of the fire became more intense."

According to Holman's testimony, defendant suggested several ways in which she could start a fire in her home. He told her that she could leave a pile of newspapers next to some candles and blame the cat for knocking over a candle or she could start an electrical fire by not turning off appliances such as the electric coffee maker, the clothes dryer or the crock pot. Holman further testified that one day defendant brought her to a flea market to look for electrical appliances that could be used to start a fire.

Holman then testified that, on June 5, 1996, at some point between the time that she normally awoke (5 a.m.) and the time

that she usually left the house (between 6:25 and 6:35 a.m.), defendant telephoned her and informed her: "This is the day. This is it." She further testified that defendant told her to leave the coffee pot running and to switch on the dryer before she left for work, and he also admonished her not to take anything out of the house. He told her: "Do not whatsoever take anything out of that house, not one single thing."

Nevertheless, according to Holman's own testimony, she did remove one item before she left the house—namely, a photograph of defendant that was on a nightstand in her bedroom. Holman testified that she could not recall whether she had let her cat go outside and that she was "probably so nervous" that she did not think of the cat.[6] She added that she locked the door behind her when she left and that defendant also possessed a key to the lock.

As she was returning home later that day, Holman was stopped by the fire chief. He told her that her house was on fire, and he then drove her in his car to her property. Later, Holman unsuccessfully attempted to contact defendant Gordon from her daughter-in-law's home in Chepachet.

On the day after the fire, Holman returned to her property to meet with a representative of the insurance agency. She testified that Gordon was there when she arrived and that one of the first things

he said to her was: "I told you not to take anything out of that house; nothing." She testified that, when she denied having deviated from his instruction, Gordon responded by saying: "Oh. Doesn't it look cute you walking around with a framed picture of me in your pocketbook." Holman also testified that, while displaying "a crooked type of grin," Gordon said in a proud manner: "I did a good job, didn't I? Did a good job, didn't I?" She further testified that he was "still snickering and proud of himself" when he said to her: "You know, when I do something, I do it right." [7]

On July 7, 1996, Holman went to stay with two friends in North Dartmouth, Massachusetts, after a violent incident had taken place between her and defendant.[8] She testified that she revealed to her friends in North Dartmouth that defendant had "burned [her] house down." She further testified that, when her North Dartmouth friends became aware of her situation, they arranged for her to speak with their minister. She did so, and the minister urged her "to come forward and turn [herself] in."

Accordingly, on July 9, 1996, Holman went to the Foster Police Department, where she gave two statements to the police. She was arrested the next day. The state charged her with first-degree arson, conspiracy, and insurance fraud. She testified that she was held at the ACI's intake center for eight days and that

---

**6.** In a statement that she gave to the police just over one month after the fire, Holman stated that she had "left the cat sleeping on the couch."

**7.** Holman also testified as follows:

"He [Gordon] said, 'Why didn't you let the cat out of the house?' I specifically remember saying, 'You told me not to take anything out of the house.' In my own mind though, I was thinking, you know, I didn't even know she was in the there."

She further testified that defendant responded as follows to what she had said about the cat: "Well, I let [the cat] out."

**8.** The defendant was charged with assault with a dangerous weapon and simple assault as a result of this incident. He was eventually acquitted of those charges by the same jury that found him guilty of the charges which are the subject of this appeal. *See* footnote 1, *supra.*

she was released after she agreed to cooperate with the prosecution.[9]

The defendant was also arrested on July 10, 1996. His case was reached for trial on September 19, 2002. At the conclusion of the trial, the jury found him guilty of first-degree arson, conspiracy, and insurance fraud. He timely appealed his conviction to this Court.

## II

### Analysis

#### A. Preparation Time and Access to Discovery.

Gordon does not challenge the validity of the trial justice's ruling that he had, by his own conduct, waived and forfeited his right to court-appointed counsel.[10] Nor does he challenge the trial justice's finding that he had shown himself to be unable or unwilling to cooperate with *eight successive court-appointed attorneys*, who had previously been appointed to represent him in this case.[11]

Gordon does challenge, however, what he considers to be the insufficient amount of time that was allotted to him for the preparation of his case on a *pro se* basis after the trial justice made his ruling. He maintains that the trial justice erred in commencing the trial on the very next day after ruling that defendant had to proceed *pro se* with standby defense counsel, and he contends that the trial justice should have provided him with more access to discovery materials and with a continuance so that he could become familiar with those materials. Gordon asserts that these actions (as well as what he claims was a violation of his right to private counsel [discussed in the next section of this opinion]) "placed [him] at an unfair disadvantage sufficient to deprive him of his Constitutional right to due process."[12]

9. On August 7, 1997, Holman entered into a formal cooperation agreement with the prosecution.

The cooperation agreement provided that, in exchange for Holman's past and continued cooperation and truthful testimony "in connection with prosecution of all criminal cases brought as a result of the fire," the prosecution would agree to allow her to submit a plea of *nolo contendere* to the conspiracy and insurance fraud charges and to an amended charge of third-degree arson. The agreement also provided that the prosecution would recommend that Holman be sentenced to serve the following concurrent terms of imprisonment: twelve years on the third-degree arson charge, ten years on the conspiracy charge, and one year on the fraud charge. The prosecution also agreed to recommend that the sentences be suspended with probation and that Holman be ordered to pay reasonable restitution.

Later on the same day, a justice of the Superior Court accepted the proffered plea and sentenced Holman in accordance with the prosecution's recommendations.

10. The trial justice made the following specific finding:

"I find that this defendant's discharging of each attorney in the fashion that he did, by filing complaints, by using vulgar language, by, in one instance at least, a veiled threat, did this purposefully to delay, and that is his tactic. The Court finds in addition to a waiver, this defendant forfeited the right to counsel, and the case will proceed to trial at two o'clock."

11. In making his ruling, the trial justice was laudably explicit about his perception of what had been taking place:

"It's clear to this Court, to this Judge, that this defendant commenced a campaign to delay this trial in the hope that it's going to go away. He did that by consciously, with purpose, rejecting every attorney appointed for him by this Court, a total of eight attorneys. Any one of them is more than qualified to handle this case. If I was accused of a crime, I would have no hesitation of having any one of these attorneys to represent me in the Superior Court or anyplace else."

12. In considering defendant's several arguments, it should be borne in mind that the public also has an interest—*viz.*, its right to

We are unable to perceive any due process violation in the instant factual situation.

### (1) Preparation Time

■ On September 17, 2002, the trial justice ruled that defendant would be required to proceed *pro se*, with the assistance of standby defense counsel. In doing so, the trial justice stated: "I'll indicate on the record tomorrow morning why this case is going to proceed." The next morning, the trial justice gave a detailed and comprehensive explanation of his ruling and ordered the trial to begin later that afternoon.[13] At no point during the course of these pre-trial proceedings did defendant request a continuance for the purpose of preparing for trial. The preparation time issue, therefore, has been waived. *See, e.g., State v. Saluter,* 715 A.2d 1250, 1258 (R.I.1998) ("It is axiomatic that 'this [C]ourt will not consider an issue raised for the first time on appeal that was not properly presented before the trial court.'") (quoting *State v. Gatone,* 698 A.2d 230, 242 (R.I.1997)).[14]

### (2) Access to Discovery

■ In his brief to this Court, defendant maintains that "[w]hile the Trial Court made rulings to facilitate the delivery of discovery to Mr. Gordon, [he] could not make practical use of discovery because he was deprived of the time required to become familiar with it."

■ Rule 16 of the Superior Court Rules of Criminal Procedure governs the discovery process in Rhode Island. The purpose of the rule is to ensure that criminal trials are fundamentally fair. *See State v. Coelho,* 454 A.2d 241, 244 (R.I. 1982) (quoting with approval the following portion of the advisory committee note to Rule 16 of the Federal Rules of Criminal Procedure: "[B]roader discovery by both the defense and the prosecution will contribute to the fair and efficient administration of criminal justice by aiding in informed plea negotiations, by minimizing the undesirable effect of surprise at trial, and by otherwise contributing to an accurate determination of the issue of guilt or innocence."). The quoted statement is consistent with constitutional due process guarantees. *See State v. Leonardo,* 119 R.I. 7, 11, 375 A.2d 1388, 1390 (1977) ("There is no question that due process requires that every defendant have a full opportunity to establish the best and fullest defense available to him.").

In the present case, Gordon does not assert (nor could he) that he was completely denied access to discovery materials. He maintains instead that the access that he did receive was essentially useless to him because, he contends, the trial justice abused his discretion in not granting him a continuance of sufficient duration so that he could familiarize himself with the discovery materials.

---

" 'the efficient and effective administration of criminal justice.' " *State v. Dias,* 118 R.I. 499, 503, 374 A.2d 1028, 1030 (1977); *see also State v. Bruyere,* 751 A.2d 1285, 1287–88 (R.I.2000); *State v. Kennedy,* 586 A.2d 1089, 1091 (R.I.1991).

13. Before explaining his rationale for the previous day's ruling, the trial justice said:
"Because Mr. Gordon is, at this point, pro se in this case, the Court is going to take some time and spread on the record a little

bit about the background of the case to the knowledge of the Court and some of the motions filed by the defendant."

14. Moreover, in view of Gordon's inability or unwillingness to cooperate with *eight successive court-appointed attorneys* prior to being required to proceed on a *pro se* basis, we are not inclined to overlook defendant's waiver of the preparation time argument. Actions have consequences.

The grant or denial of a motion to continue a case lies at the sound discretion of the trial justice. *State v. Caprio*, 819 A.2d 1265, 1269 (R.I.2003) ("We will not disturb a hearing or trial justice's decision on a motion to continue absent an abuse of discretion."); *see also State v. Bruyere*, 751 A.2d 1285, 1287 (R.I.2000); *Gatone*, 698 A.2d at 239. Whether the denial of a motion to continue constitutes a denial of due process depends on the particular circumstances of each case. *See Leonardo*, 119 R.I. at 11, 375 A.2d at 1390. ("There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reason presented to the trial justice at the time the request is denied.").

Before the trial commenced, the trial justice had ordered the last of Gordon's several court-appointed attorneys to give all the discovery that he possessed "to Mr. Gordon for his use for whatever purpose he wants to use them." The attorney indicated to the court that he had placed two boxes of discovery "behind Mr. Gordon in case he should need them for trial." In addition, the trial justice granted defendant the authority to issue subpoenas.

The next day, the trial justice ordered that the discovery materials be delivered to defendant at the ACI. Standby defense counsel for defendant later indicated to the court that he had brought the discovery materials to the ACI and that he and defendant discussed the case in a small private room at the prison. Standby defense counsel further indicated that he was not allowed to leave the discovery materials at the ACI because he was told by a prison officer that the materials were "a fire hazard."

When the trial justice learned about the prison officer's refusal to allow defendant to keep the discovery materials at the ACI, he personally called the prison and spoke with Patricia Coyne Fague, legal counsel to the ACI. The trial justice stated that "Miss Fague indicated to the Court, to me personally, that if the discovery was delivered to her * * * she would personally see to it that the defendant [would receive] the discovery today at the ACI."

The following colloquy then took place between standby defense counsel and the trial justice:

"MR. RUGGIERO: Your Honor, I told [Gordon] that, and he told me he was not comfortable with the State getting the discovery and giving it to him. I told him I would personally give him the discovery if they gave me permission to do so, and I'm willing to do so or have that person accompany me to Maximum.

"THE COURT: Let me put it this way. If that can be worked out with legal counsel for the ACI, fine. But if they take the position that she's going to deliver it, I'm going to allow that, Mr. Ruggiero.

"MR. RUGGIERO: Okay, Judge.

"THE COURT: Patricia Coyne Fague is a trusted officer of this Court. I have dealt with her before * * * on many occasions, and I trust she will do the right thing with that discovery. If the defendant has any objection to that, that objection is overruled.

"MR. RUGGIERO: Well, also, Judge, I left the two boxes of discovery with the capitol police upstairs. I told them to secure it and make sure nobody looked at it.

He's very uncomfortable with that, and I guess he wants to address the Court.

"THE COURT: I'm not here to make Mr. Gordon comfortable. I'm here to

get this trial completed in a fair fashion. That's what I'm trying to do. If Mr. Gordon sees devils all over the place, that's not my problem."

At the conclusion of the trial testimony of Lorraine Holman, standby defense counsel requested a continuance so that defendant could review the discovery materials. The trial justice responded by stating:

"As to giving this defendant time to prepare to cross-examine, I think between now and two o'clock, he should have enough time. The reason why I say that is because in his opening statement, he mentioned a lot of this information that Ms. Holman testified about." [15]

When the trial reconvened after the lunchtime break, however, the trial justice continued the case until the next day, despite the fact that he believed that defendant was already familiar with the discovery materials.[16]

On the next day, defendant again asserted that he had not had enough time to review the discovery materials, to which assertion the trial justice responded: "I might add for the record that the reason why, if there's any problem with Mr. Gordon not having discovery, which I don't think is the case, he decided to fire eight lawyers."

After reviewing the record, we conclude that the trial justice did not abuse his discretion in denying defendant's motions for continuances. We commend the trial justice for his patience in ensuring that defendant was given appropriately arranged access to discovery, and we are satisfied that defendant was familiar enough with that discovery so that he was not denied his constitutional right to due process.

## B. The Right to Counsel

■ The Sixth Amendment to the United States Constitution and article 1, section 10, of the Rhode Island Constitution provide that, in all criminal prosecutions, the accused shall enjoy the right to the assistance of counsel in his or her defense. A defendant may, of course, waive that right to counsel. *See State v. Laurence,* 848 A.2d 238, 252 (R.I.2004) ("The Sixth Amendment also allows a defendant in a criminal trial to represent himself, provided that his waiver of counsel is valid."). A valid waiver may be demonstrated by a defendant's own actions. *See id.* at 254 ("The defendant's actions, rather than his words, demonstrate that he waived his right to counsel."); *State v. Thornton,* 800 A.2d 1016, 1026 (R.I.2002) ("[The defendant's] repeated refusal to accept the services of competent court-appointed defense counsel demonstrates clearly the voluntary waiver of his right to counsel, and that he was not in any way unconstitutionally 'forced' to proceed *pro se.*").

■ On appeal, Gordon appears to argue that, even though he may have waived and forfeited his right to court-appointed counsel, that waiver and forfeiture did not apply to his right to retain private counsel.

---

**15.** The record reveals that, in his opening statement, defendant tried to call the prosecution's case-in-chief into doubt by questioning the sufficiency of the evidence that the prosecution proposed to introduce.

**16.** The trial justice specifically told defendant: "I want you, Mr. Gordon to prepare whatever cross-examination you feel you have to prepare for, and there will be no further continuances in order to do that. * * * I know you know the discovery already, in any event, but I'm going to continue this matter. Prepare for cross-examination of Miss Holman and any other witness you want to examine."

We are not able to perceive any such distinction under either the Sixth Amendment to the United States Constitution or article 1, section 10, of the Rhode Island Constitution. *See Laurence,* 848 A.2d at 252 ("Whether defense counsel is *retained or appointed,* this right [to the assistance of counsel] ensures that the trial is fair.") (emphasis added); *see also State v. Carruthers,* 35 S.W.3d 516, 549 (Tenn.2000) ("The idea that the right to counsel may not be used to manipulate or toy with the judicial system applies equally to indigent and non-indigent defendants.").

▉ Even if we were to accept Gordon's contention that there is such a distinction (and we do not), the record in this case fails to indicate that defendant Gordon did in fact retain private counsel to represent him in this matter. On the third day of the trial, Attorney Dina Paolino appeared in open court and made the following statement:

"I apologize for my appearance, your Honor. I received a phone call early this morning from Mr. Gordon's father, Mr. David Gordon. He stated that he spoke with his son last evening at the ACI and that the son requested I come down today to speak with him, that *possibly I enter my appearance.* Since I received that call this morning, as I was out walking, I came here as soon as possible. I did leave your Honor a message as soon as I received a message. So, I am here at this point in time. *I have not even spoken with Mr. Gordon, so I'm not certain if his position is to have a new attorney to enter representation or to discuss negotiations. I have no idea at this point in time.* I understand that this case has been continued ad nauseam over the years, so *it's obviously the Court's discretion as to whether or not they would allow me to speak with Mr. Gordon and/or represent him*

*in this case* without asking for any type of continuance." (Emphasis added.)

The trial justice responded by stating:

"The case is in the middle of trial, Miss Paolino. The case was continued about eighty-four times from 1997. It's not going to be continued again. The case will be completed. Standby counsel is Mr. Ruggiero, an extremely competent criminal defense lawyer, and I'm not going to allow you to enter. If that's your request, denied.

At that point, Attorney Paolino responded by simply saying: "Thank you, your Honor."

It is clear from this colloquy that defendant Gordon did not in fact retain Attorney Paolino to represent him. As of the morning of the third day of trial, Attorney Paolino had never even spoken to defendant—much less had she agreed to represent him. In addition, Ms. Paolino indicated that she was unclear as to whether Gordon would be asking her to enter her appearance.

Even if we assume *arguendo* that Attorney Paolino was actually seeking to enter her appearance and was not merely considering that possibility, we would perceive no abuse of discretion in the trial justice's decision not to allow her to enter her appearance. (Abuse of discretion is the applicable standard of review in this regard. *United States v. Rodriguez Vallejo,* 496 F.2d 960, 965 (1st Cir.1974).) When Attorney Paolino appeared in the courtroom, it was the third day of a criminal trial before an impaneled jury, and jeopardy had attached. *See Bruyere,* 751 A.2d at 1287. There comes a point when the exigencies of trial administration may properly trump a defendant's change of heart as to the legal representation issue. *See Commonwealth v. Jackson,* 376 Mass. 790, 383 N.E.2d 835, 839 (1978) ("While we recognize the importance of counsel, we

reject any suggestion that every defendant has an absolute right at the moment trial is to begin to retract his decision to represent himself."). There is genuine sagacity in the First Circuit's comment that "[t]he right to counsel may not be manipulated in a cat and mouse game with the court." *Rodriguez Vallejo*, 496 F.2d at 965.

### C. Qualification of the Prosecution's Witness as an Expert

 Gordon asserts that the trial justice abused his discretion in qualifying fire investigator John B. Fiore as an expert witness for the prosecution.[17] He maintains that Fiore's credentials were insufficient to qualify him as a fire investigator because (according to defendant) he "lacked recent education" in fire science.

 The determination of the admissibility of expert testimony is in the discretion of the trial justice. *See State v. Werner*, 851 A.2d 1093, 1100 (R.I.2004) ("The trial justice has sole discretion to qualify a witness as an expert."). We will disturb a trial justice's discretionary determination on this issue only if he or she has abused that discretion. *State v. Gough*, 810 A.2d 783, 785 (R.I.2002) ("The determination of admissibility of opinion evidence and qualifying expert witnesses rest 'in the sound discretion of the trial justice and will not be disturbed absent a showing of an abuse of that discretion.' ").

 Rule 702 of the Rhode Island Rules of Evidence governs the admissibility of an expert witness to testify at trial. Rule 702 provides:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of fact or opinion."

It is not necessary that the proffered expert hold a particular license, title or certificate in a specialized field for that expert to be qualified to testify. *Raimbeault v. Takeuchi Manufacturing (U.S.), Ltd.*, 772 A.2d 1056, 1061 (R.I.2001) ("An expert need not have a license in a narrow specialty, nor hold a particular title, as long as his or her 'knowledge, skill, experience, training, or education' can deliver a helpful opinion to the fact-finder."); *see also State v. Morales*, 621 A.2d 1247, 1249 (R.I.1993).

During the trial, the prosecution asked Mr. Fiore a series of questions intended to elicit from him the extent of his knowledge, training and experience in the field of fire investigation. He testified about his training and further testified that over the course of his career he had investigated "over a thousand, eleven hundred" fires. He also testified that, at any given time, he carried a heavy caseload of approximately thirty-five to forty fire investigations.

When the prosecution later asked Mr. Fiore about his opinion as to the cause of the fire at the Holman residence, Gordon objected on grounds that Mr. Fiore had not been qualified as an expert.[18] The trial justice overruled the objection after making the following finding:

---

17. John B. Fiore retired between the time he investigated the fire and the commencement of the trial. At the time he investigated the fire, he was a fire investigator for the Rhode Island State Fire Marshal's Office.

18. It should be noted that, although the prosecution did not actually move to have Mr. Fiore qualified as an expert witness, the prosecution submitted sufficient evidence for the trial justice to make a determination on that issue.

"The witness has testified that he took a three-week course, totaling one hundred twenty hours at the fire school in Maryland, that he had attended numerous seminars, and those seminars and the courses that he took at that time involved points of origin of fires, not only points of origin, but causes of fires. I believe that qualifies the witness to testify."

In view of the considerable testimony as to Mr. Fiore's training and experience, it is our definite opinion that the trial justice did not abuse his discretion in qualifying Mr. Fiore as an expert in this case.

### D. Financial Resources for the Defense

 Gordon contends that the trial justice erred in arbitrarily denying a request made by standby defense counsel to hire an investigator to assist him in locating and serving certain witnesses whom defendant had attempted to serve, but could not find.

 The Sixth Amendment to the United States Constitution provides that: "In all criminal prosecutions, the accused shall enjoy the right * * * to have compulsory process for obtaining witnesses in his favor." That right, however, is not absolute. *State v. Gehrke*, 835 A.2d 433, 436 (R.I.2003) ("[A] defendant's right to present witnesses on his or her behalf is not absolute."). Compulsory process is an optional tool available to a defendant and it should be employed responsibly and with deliberation. *Id.* ("The very nature of the right requires that its effective use be preceded by deliberate planning and affirmative conduct.") (quoting *Taylor v. Illinois*, 484 U.S. 400, 410, 108 S.Ct. 646, 98

L.Ed.2d 798 (1988)). It is a defendant's duty to locate his or her witnesses before trial. *Gehrke*, 835 A.2d at 437 ("In preparing for trial, defendant was obligated to exercise due diligence to discover potential witnesses.").

In the present case, the record reveals that this case was continued more than eighty times and did not come to trial until more than six years after defendant's arrest. Just before the trial began, the trial justice observed that, in addition to having had eight court-appointed attorneys, defendant had been provided with money to hire an investigator and an expert witness.[19] The defendant was also given the authority to subpoena witnesses and was afforded the assistance of the sheriff's office in connection with the service of subpoenas.

Nine days into the trial, standby defense counsel noted for the record that the sheriff's office had been unable to locate four witnesses and requested that the Court provide defendant with additional money to hire an investigator so that he could locate and serve those witnesses. At no point did standby defense counsel or defendant make an offer of proof as to the subject on which either of them expected the missing witnesses would testify, nor did they point to any prejudice that defendant might suffer should those witnesses fail to testify. Indeed, even defendant's appellate brief does not indicate what prejudice defendant allegedly suffered due to the fact that he was unable to locate the persons whom he describes as "certain witnesses."

In view of the foregoing facts and considerations, we conclude that defendant

---

**19.** The trial justice specifically found:
"I might add, in looking through this file, that the Court also provided Mr. Gordon funds for an expert witness and for an investigator. Those requests were made by counsel for the defendant, who were later discharged."

had ample time and opportunity to locate his alleged witnesses before trial, but that he failed to do so in a timely manner. As a result, we also conclude that the trial justice did not err in denying standby defense counsel's last-minute request for additional money in order to retain an investigator to locate the persons whom he describes as "certain witnesses."

### E. Cross–Examination of Defendant

Finally, defendant contends that his Fifth and Fourteenth Amendment rights were violated because, he maintains, he was forced to incriminate himself on the stand. Specifically, he asserts that the trial justice erred in permitting the prosecution to conduct what he describes as "unlimited" cross-examination, which he says was "far in excess of the scope of defendant's testimony on direct examination."

A trial justice's determination as to the permissible scope of cross-examination is discretionary and will not be disturbed by this Court unless that discretion was clearly abused and constituted prejudicial error. *See State v. Oliveira,* 730 A.2d 20, 24 (R.I.1999) ("We adhere to long settled doctrine in this jurisdiction that a trial justice is given wide discretion to permit or limit counsel's cross-examination of witnesses during trial, and that discretion, absent a showing of clear abuse, will not be disturbed on appeal, and then, only if such abuse constitutes prejudicial error."); *see also State v. Benevides,* 420 A.2d 65, 69 (R.I.1980) ("[T]he permissible scope and extent of cross-examination rests in the sound discretion of the trial justice, * * * and his rulings thereon will only be reviewed for an abuse of discretion."); *State v. Crescenzo,* 114 R.I. 242, 252, 332 A.2d 421, 428 (1975) ("Since the basic purpose of cross-examination is the impeachment of the witness, there can be no fixed limit as to the scope of proper cross-examination and much must be left to the judicial discretion of the trial justice.").

Although cross-examination is generally limited to the scope of direct examination, questions calculated to explain, contradict or discredit a witness's testimony or designed to test the witness's accuracy, memory, veracity, credibility or bias are often permissible. *Benevides,* 420 A.2d at 69 ("In this jurisdiction cross-examination of a witness is generally limited in scope to matters testified to on direct examination. * * * Also permitted on cross-examination are questions designed to explain, contradict, or discredit any testimony given by a witness on direct examination, or to test his accuracy, memory, veracity, or credibility."); *see also State v. Crowhurst,* 470 A.2d 1138, 1143 (R.I.1984) ("[S]ince the purpose of cross-examination is to impeach a witness's credibility, the general rule that confines the scope of cross-examination to facts brought out during direct examination is inapplicable when the questions are designed either to explain, contradict, or discredit any testimony given by the witness on direct examination or to test his accuracy, memory, veracity, or credibility.").

The just-mentioned principle is particularly compelling in a case in which the defendant has chosen to testify in his or her defense. *See State v. Mattatall,* 603 A.2d 1098, 1111 (R.I.1992) ("A defendant who testifies on his own behalf is a witness and is subject, therefore, to a searching cross-examination to rebut not only the facts stated but also the inferences and conclusions that might be drawn from such testimony.") (internal citations omitted); *State v. Dowell,* 512 A.2d 121, 124 (R.I. 1986) ("Even illegally obtained evidence may be admitted for impeachment purposes when a defendant gives testimony

that may be construed as absolving himself from fault in a criminal case.").

 During the trial, Gordon took the stand in his own defense and answered questions posed to him by standby defense counsel.[20] His direct testimony reads as follows in its entirety:

"Q. Mr. Gordon, going back to June the 5th, 1996, did you reside at 32 Farnum Street, North Providence?

"A. Yes, I did.

"Q. Did you leave your residence that day at any time?

"A. Yes.

"Q. When was that?

"A. Approximately five p.m.

"Q. Other than that, did you leave your residence at all that day?

"A. No, I did not."

It is clear from this direct testimony that defendant was attempting to establish an alibi for himself. In order to rebut this purported alibi, the prosecution was entitled to go beyond the scope of Gordon's direct testimony, and the trial justice did not abuse his discretion in allowing the prosecution to do so.

It should also be noted that, despite defendant's assertion that the trial justice permitted "unlimited" cross-examination, our review of the record reveals that that was not the case. Before Gordon took the stand, the trial justice had limited the scope of the cross-examination which the prosecution might conduct: (1) by precluding certain incriminating statements that defendant made to the police; and (2) by granting defendant's motion *in limine* to prevent the state from introducing his prior conviction for first-degree arson and

conspiracy to commit arson. *See State v. Gordon,* 508 A.2d 1339 (R.I.1986).

## Conclusion

For the foregoing reasons, the judgment of the Superior Court is affirmed. The record may be returned to the Superior Court.

---

20. Furthermore, we note that it was defendant who chose to take the stand to testify in his own defense. At no point during his testimony did defendant invoke his Fifth Amendment privilege; consequently, he waived constitutional privilege against self-incrimination.