Carri OLIVEIRA, Individually and as Administratrix of the Estate of Djonen Oliveira and Jose Oliveira

v.

Lisa J. JACOBSON, M.D. et al.

No. 2002–581–Appeal.

Supreme Court of Rhode Island.

April 15, 2004.

Present: WILLIAMS, C.J.,
GOLDBERG, FLAHERTY, and
SUTTELL, JJ.

## OPINION

GOLDBERG, Justice.

In this appeal, the defendants, Lisa J. Jacobson, M.D. (Dr. Jacobson), and Women and Infants Hospital (WIH or collectively defendants), appeal from an adverse jury finding of liability for the death of a newborn, Djonen Oliveira (Djonen), who died as a result of negligent medical care

during his delivery. Both the defendants also appeal from the denial of their motion for judgment as a matter of law and motion for a new trial. Discerning no error, we affirm the judgment of the Superior Court.

## Facts and Travel

This case concerns the tragic death of Djonen, son of Jose and Carri Oliveira, who died from asphyxiation twenty-seven minutes after his birth on January 24, 1997. On February 10, 1999, the plaintiffs, Carri and Jose Oliveira, filed malpractice actions against the attending physician, Dr. Jacobson, and the resident on duty, Sareeta H. Bjerke, M.D. (Dr. Bjerke). The Oliveiras also filed suit against WIH based on an alleged agency relationship between the hospital and the two doctors.

The Oliveiras alleged that Djonen's death was caused by the negligence of Drs. Jacobson and Bjerke. Carri, who already was in labor when she was admitted to WIH, delivered Djonen by way of caesarean section at 8:28 p.m., some thirteen hours after admission. The plaintiffs demonstrated that the standard of care required that defendants deliver Djonen by caesarean section shortly after 7:14 p.m., and that the additional delay caused by Dr. Jacobson's and Dr. Bjerke's repeated attempts to deliver Djonen vaginally was the proximate cause of his death by asphyxiation.

At trial, plaintiffs presented expert witness testimony that Drs. Jacobson and Bjerke should have known that Djonen could not be delivered safely vaginally based on a number of factors that were present during Carri's labor. These warning signs included: (1) Carri's slow labor progression; (2) vaginal examinations revealing that the position of Djonen's head made it very difficult for him to progress through the birth canal; and (3) the fetal heart monitor, which was attached to monitor the baby's well-being, showed signs that Djonen was experiencing distress and oxygen deprivation as Carri attempted to give birth vaginally.

Furthermore, at 6:45 p.m., more than twelve hours after Carri was admitted, a vaginal exam revealed that despite two hours of pushing, Djonen had not progressed any farther in the birth canal. The fetal heart monitor indicated that although Djonen continued to be distressed, he remained neurologically intact. This crucial point was evidenced by the positive scalp stimulation/accelerations noted on the fetal heart monitor.

At or around 6:45 p.m., Dr. Bjerke, who was chief resident at WIH that night, called Dr. Jacobson to discuss Djonen's delivery. As the attending obstetrician, Dr. Jacobson was responsible for supervising the residents. During their consultation, Dr. Jacobson and Dr. Bjerke determined that Carri's labor had not progressed and it was necessary to assist Djonen's delivery with forceps. They also decided that if the attempt to deliver vaginally with forceps was not successful, they would proceed to a caesarean section. The plaintiffs' experts testified that this plan was consistent with the requisite standard of care.

Doctor Jacobson attempted to deliver Djonen with forceps but was not successful. At 7:14 p.m., Dr. Jacobson alone made the decision to attempt further vaginal delivery with the assistance of a vacuum extractor, despite the earlier decision to proceed to a caesarean section if the forceps failed. Doctor Jacobson's efforts were still unsuccessful and her attempts to rotate Djonen's head into a better birthing position with the use of the vacuum also failed.

During Dr. Jacobson's attempts to deliver Djonen with the vacuum, Dr. Bjerke

exited the delivery room and sought the assistance of Dr. Magendantz, another attending doctor. At Dr. Magendatz's direction, Carri was transported to the operating room. While he was waiting for the operating room to be prepared for surgery, Dr. Magendantz made one final attempt at a forcep delivery, to no avail. He immediately performed the caesarean section. Djonen was delivered at 8:28 p.m., but he was unable to breathe and had a weak heartbeat. Despite attempts to resuscitate him, the infant was pronounced dead twenty-seven minutes later.

At the center of the evidence in this case were two autopsy reports that were completed by staff pathologists at WIH. An initial autopsy report was completed on March 31, 1997, by Calvin Oyer, M.D. (Dr. Oyer). That report concluded by summarizing "this [full] term male infant underwent a complicated birth process * * *. Irreversible changes secondary to asphyxia resulted in death."

WIH scheduled an autopsy conference with the Oliveiras for May 20, 1997. On the day of the conference, however, Carri was accompanied by a nurse employed by the law firm retained by the Oliveiras to investigate their son's death. When Carri arrived for the conference accompanied by the law-firm employee, WIH postponed the conference until May 28, 1997. The autopsy report was changed in the interim.

On May 27, 1997, Dr. Oyer issued an "Addendum" and "Additional Diagnosis" to the autopsy report. The addendum changed the cause of death to sepsis (overwhelming systemic infection), although Dr. Oyer maintained that the mechanism of

death was asphyxiation. A finding of sepsis as the cause of death, if believed, would have provided defendants with a causation defense at trial.

Jose and Carri Oliveira filed a wrongful death lawsuit on February 10, 1999. After a three-week trial, the jury returned a verdict in favor of plaintiffs against Dr. Jacobson and WIH in the amount of $2,300,000. The verdict was apportioned as follows: $100,000 for Djonen's pain and suffering, $700,000 for Djonen's economic loss, and $1,500,000 for the Oliveiras' loss of society and companionship. Additionally, the jury found in favor of Dr. Bjerke.

On February 6, 2002, Dr. Jacobson and WIH filed a motion for a new trial and a renewed motion for judgment as a matter of law. On May 22, 2002, the trial justice issued a written decision denying those motions. This appeal followed.

# I

## Jury Instruction

■ The defendants contend that the trial justice committed reversible error by instructing the jurors to limit their determination of negligence to the three defendants before them, and not to speculate about the medical care provided by other doctors who were not parties to the lawsuit.[1] Specifically, defendants allege that the jury should have been allowed to consider Dr. Magendantz's subsequent treatment of Carri and Djonen as it pertained to the standard of care the jury should apply to defendants. The defendants reason that because *plaintiffs' own experts* testified that Dr. Magendantz's final at-

---

1. Specifically, the trial justice instructed the jury as follows:
   "Defendants Jacobson, Bjerke and Women & Infants Hospital are the only defendants in the matter before you. You're instructed that you are only to consider the issue of negligence as it pertains to them. You're not to speculate regarding any other treatment and care received by Djonen Oliveira. Whether or not any doctor not a party to this lawsuit was negligent or not is not relevant to your deliberations."

tempt to use forceps was justified and within the applicable standard of care, *even though it further delayed Djonen's delivery,* the jury should have been allowed to consider Dr. Magendantz's care and treatment in determining whether defendants were negligent. The defendants moved the trial justice for a new trial based on this purported error, and maintain their assignment of error and request for a new trial on appeal.

When considering a motion for a new trial, the trial justice sits as a superjuror: he or she must weigh and evaluate the evidence, and assess the credibility of the trial witnesses. *Hefner v. Distel,* 813 A.2d 66, 69 (R.I.2003) (per curiam). If, in his or her independent judgment, the evidence is balanced and reasonable minds could differ on the outcome, the trial justice must approve the verdict. *Skene v. Beland,* 824 A.2d 489, 493 (R.I.2003) (per curiam). If, however, the verdict is not supported by credible evidence, a new trial should be ordered. *Id.* On appeal we accord great weight to a trial justice's decision on a motion for a new trial, and will not disturb it unless it is clearly wrong or otherwise overlooks or misconceives material and relevant evidence. *Id.*; *Graff v. Motta,* 748 A.2d 249, 255 (R.I.2000).

We discern no error in the trial justice's instructions to the jury, and conclude that defendants' reasoning is untenable. Although it is true that we hold physicians to a duty of care that is expected of a reasonably competent practitioner acting under similar circumstances, *Sheeley v. Memorial Hospital,* 710 A.2d 161, 167 (R.I.1998), the trial justice specifically found that Drs. Jacobson and Magendantz were not operating under similar circumstances when they attempted to deliver Djonen with forceps. Doctor Magendantz was called into Carri's delivery at the last hour and faced an emergency situation with which he had to quickly familiarize himself as he was preparing for surgery. Furthermore, Dr. Bjerke testified that Dr. Magendantz had an unusual expertise with forceps. He attempted to vaginally deliver Djonen only *after* Carri had been transferred to the operating room and while he was waiting for that operating room to be prepared for surgery. There is no evidence that these efforts delayed the surgery. When Dr. Magendantz's forceps attempt was unsuccessful, he immediately performed the caesarean section, rendering any additional delay in Djonen's birth minimal. The difference in time, place and skill level distinguish the level of care provided by Dr. Jacobson and Dr. Magendantz so that the trial justice's instruction to the jury was correct and warranted.

Moreover, defendants' failure to present any evidence relative to the care provided by Dr. Magendantz renders them ill-equipped to refute the trial justice's findings of fact or conclusions of law. The defendants never made Dr. Magendantz's treatment of Carri a subject of their standard of care demonstration to the jury. There was no testimony that Dr. Magendantz's take-charge emergency treatment was in fact an appropriate measure of defendants' standard of care. To the contrary, there was explicit testimony that it *was not* appropriate to draw comparative inferences from Dr. Magendantz's actions. The same expert that testified that Dr. Magendantz's treatment met the applicable standard of care also opined that defendants' treatment did not meet the standard of care.

To follow defendants' hypothesis, the jury first would have to determine whether Dr. Magendantz was negligent. Assuming that he was found not to be negligent, the jury would then have the difficult task of determining what relevance, if any, Dr. Magendantz's treatment had on defen-

dants' duty of care. Such an instruction would have been convoluted at best, confusing and prejudicial at worst, especially in light of defendants' failure to offer any proof on either of these issues. Accordingly, the trial justice correctly narrowed the jury's focus to the issue of defendants' negligence. There was no error.

## II

### Pain and Suffering

■ The defendants next assign error to the trial justice's decision to instruct the jury on Djonen's pain and suffering. According to defendants, the record contains no evidence supporting the conclusion that Djonen's distress was anything other than that normally associated with childbirth. Therefore, defendants argue that an instruction permitting recovery for pain and suffering misconceives material evidence concerning Djonen's condition immediately after he was delivered, and warrants a new trial.

■■ We note that "no mathematical formula exists for awarding a plaintiff damages for his or her pain and suffering, which is in the nature of compensatory damages." *Grieco ex rel. Doe v. Napolitano,* 813 A.2d 994, 998 (R.I.2003) (quoting *Trainor v. Town of North Kingstown,* 625 A.2d 1349, 1350 (R.I.1993) (per curiam)). Such an award, however, must be consistent with the evidence and not unduly motivated by sympathy, passion or prejudice. *Mouchon v. Erikson's, Inc.,* 448 A.2d 776, 779 (R.I.1982).

We are satisfied that the record contains sufficient evidence to support the conclusion that Djonen's suffering far exceeded that associated with a normal delivery. When Djonen was born, he was pale and blue as a result of oxygen deprivation; his heart was barely beating. The medical charts noted that he twice attempted to

cry and gasped for breath. These same observations were contained in the operative notes of Dr. Bjerke, the progress notes of Nurse Kerwin, and the autopsy report. The multiple references to Djonen's unsuccessful struggle to breathe belie defendants' assertions that these sounds were the normal sounds of a healthy delivery.

We, like the trial justice, also deem the testimony of the Oliveiras "most compelling" in regard to the award for pain and suffering. As the trial justice eloquently described, the Oliveiras

"detailed their experiences and delivery room observations in an articulate, minimalistic, and restrained manner. Their testimony served to confirm on a personal level that which the expert witnesses and the documentation had revealed in a detached, professional manner: that the sounds they heard in the delivery room were not the normal sounds of delivery. Instead, the sounds the Oliveiras heard were the sounds of a living child struggling for breath."

In an attempt to revive Djonen, physicians made three attempts to intubate him. The plaintiffs' expert testified that intubation entails "passing a tube into the airway [to] more efficiently provide oxygen to the lungs." The first two attempts at intubation failed because the tube was inserted into Djonen's esophagus instead of his airway. In an attempt to facilitate his heartbeat, the doctors repeatedly compressed his chest.

■ There is no requirement that expert testimony be presented to recover damages for pain and suffering. A determination of this issue is within the ken and experience of a lay jury. Although Djonen survived only twenty-seven minutes after birth, the record permits the conclusion that this was an extremely traumatic and

unpleasant twenty-seven minutes of life. Furthermore, although significant, the award was only a small fraction of the entire verdict, and was not likely the result of inflamed passion or prejudice. Accordingly, we sustain the award for pain and suffering.

## III

### Cross–Examination of Dr. Lerner

During a *voir dire*, plaintiffs demonstrated that defense expert Henry M. Lerner, M.D. (Dr. Lerner), had held a paid position with Pro Mutual Insurance Company (Pro Mutual), a medical negligence insurance company in Massachusetts. The plaintiffs established that since 1990, Dr. Lerner had been paid $35,000–$40,000 a year for his services as a board member. Significantly, Dr. Lerner's *curriculum vitae*, submitted by defendants in an effort to qualify him as an expert witness, omitted this information. Doctor Lerner also failed to mention his affiliation with Pro Mutual despite being asked to enumerate the "organizations [he] had relationships with." Accordingly, the trial justice permitted plaintiffs to conduct a narrow cross-examination concerning Dr. Lerner's affiliation with Pro Mutual for the purposes of impeaching his credibility or showing his potential for bias. The defendants claim that plaintiffs' cross-examination violated Rule 411 of the Rhode Island Rules of Evidence and so prejudiced the jury as to require a new trial.

Rule 411 states that "[e]vidence that a person was or was not insured against liability is not admissible upon the issue whether he acted negligently or otherwise wrongfully." Rule 411 specifically provides for the admission of evidence of liability insurance when it is offered for other purposes, including *"bias or prejudice* of a witness, or when the court determines that in the interests of justice evidence of insurance or lack of insurance should be permit-

ted." (Emphasis added.) Furthermore, we have recently reiterated that a "basic purpose of cross-examination is to impeach the credibility of an adversary witness, and a court may within its sound judicial discretion permit interrogation designed to accomplish that purpose." *Rambone v. Town of Foster*, 741 A.2d 283, 284 (R.I. 1999) (mem.) (quoting *Bedrosian v. O'Keefe*, 100 R.I. 331, 334, 215 A.2d 423, 425 (1965)).

The trial justice properly concluded that Dr. Lerner's professional working relationship with a medical malpractice insurance company and the fact that he failed to disclose that information in his *curriculum vitae* or in response to a direct question was an impeachable omission not excluded by the provisions of Rule 411. The fact that Dr. Lerner was an active advocate or representative of an insurance company and was paid substantial compensation was relevant and probative of his potential for bias. The fact that Dr. Lerner failed to include this information on his *curriculum vitae* and neglected to mention his employment despite an express question was relevant and probative of his credibility.

Furthermore, we are not persuaded that the admission of this evidence impermissibly prejudiced the defendant under Rule 403 of the Rhode Island Rules of Evidence or Rule 411. At no time was the jury provided with any evidence that defendants themselves were or were not insured by Pro Mutual or any other insurance carrier, nor was there evidence that Pro Mutual was involved in this case in any way. The trial justice appropriately limited plaintiffs' cross-examination to Dr. Lerner's omissions from his *curriculum vitae*. There was no error.

## IV

### Judgment as a Matter of Law

The defendants' final point on appeal is that the trial justice erred by al-

lowing the jury to consider evidence of Djonen's economic loss. The plaintiffs presented expert testimony concerning Djonen's potential earning capacity. Although defendants did not directly refute this expert testimony, on appeal they contend that the plaintiffs failed to establish that Djonen was not already neurologically impaired by 7:14 p.m., and that as a matter of law, this lack of evidence dooms any causation analysis concerning Djonen's care and his subsequent economic loss. Accordingly, defendants claim error in allowing the jury to consider evidence of Djonen's economic loss and request this Court to direct a verdict vacating any award of economic damages to plaintiffs.

■ The standard of review on a motion for a judgment as a matter of law is well settled. This Court, like the trial justice, will examine

> "the evidence in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses, and draw from the record all reasonable inferences that support the position of the nonmoving party. * * * If, after such a review, there remain factual issues upon which reasonable persons might draw different conclusions, the motion for [judgment as a matter of law] must be denied, and the issues must be submitted to the jury for determination." *Estate of Fontes v. Salomone*, 824 A.2d 433, 437 (R.I.2003) (quoting *Filippi v. Filippi*, 818 A.2d 608, 617 (R.I.2003)).

Considering the evidence in the light most favorable to plaintiffs, without weighing the evidence or evaluating the credibility of witnesses, and drawing all reasonable inferences supporting their position, we have no doubt that the trial justice

correctly allowed the jury to consider evidence of Djonen's economic loss. Contrary to defendants' assertion, plaintiffs presented credible evidence that Djonen would have been neurologically intact had he been delivered at 7:14 p.m. Harlan Giles, M.D. (Dr. Giles) and Alan Kessler, M.D. (Dr. Kessler) testified as experts in obstetrics and gynecology. After reviewing Djonen's hospital records and the print-out from the fetal heart monitor, both witnesses opined that had defendants adhered to the standard of care, Djonen would have been delivered by caesarean section shortly after 7:14 p.m., and would have survived neurologically intact. To support this position, Dr. Kessler pointed to the "accelerations" on the fetal heart monitor, both before and after the 7:14 p.m. benchmark, which meant that the "baby was doing well at that particular point." Doctor Giles concurred, stating that it was the "delay in the delivery, combined with the attempted vacuum rotation, [that] was the cause of the death, the reason the baby could not be resuscitated." He further said that "if someone had taken charge, realized the delivery needed to take place, taken the patient back to the OR * * * and done a C-section [shortly after 7:14 p.m.], this baby would be *alive and well.*" (Emphasis added.)

Finally, Susan Shen–Shwartz, M.D., was established as an expert witness in pathology. She testified that she reviewed the pathology slides from Djonen's autopsy and did not find any preexisting gliosis (brain damage) or chronic infection.

Considering the evidence in the light most favorable to the plaintiffs, it is clear that reasonable minds could and did differ concerning the infant's prospects for neurological health if he had been delivered by caesarean section at or near 7:14 p.m. as

originally planned. Accordingly, the trial justice appropriately submitted the issue of Djonen's economic loss to the jury.

### Conclusion

For the foregoing reasons, the defendants' appeal is denied and dismissed.

The papers of the case are remanded to the Superior Court.

Justice FLANDERS did not participate.