June 28, 2024

**Supreme Court**

No. 2023-5-Appeal.
(WC 18-344)

John Armour, Individually and as     :
Personal Representative of the Estate
of Judith Armour

v.               :

David Bader, M.D., et al.       :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov of any typographical or other formal errors in order that corrections may be made before the opinion is published.

John Armour, Individually and as   :
Personal Representative of the Estate
  of Judith Armour

           v.          :

  David Bader, M.D., et al.     :

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Justice Lynch Prata, for the Court.** In this appeal, the plaintiff, John Armour, individually and as personal representative of the Estate of Judith Armour (plaintiff or Mr. Armour), appeals from the denial of his motion for a new trial following a verdict for the defendants, David Bader, M.D. (Dr. Bader), Neil Brandon, M.D. (Dr. Brandon), and South County Hospital Healthcare System d.b.a. South County Cardiology (South County Cardiology) in a medical negligence case.

The plaintiff challenges the trial justice's refusal to issue a jury instruction based on this Court's holding in *Oliveira v. Jacobson*, 846 A.2d 822 (R.I. 2004). The plaintiff further claims that the trial justice erred in permitting defendants' standard-of-care expert to utilize the referring doctor's records and in limiting cross-examination of that expert regarding a particular study. The defendants maintain

- 1 -

that the trial justice did not err by refusing to issue a jury instruction based on *Oliveira* and that the trial justice properly permitted defendants' standard-of-care expert to reference the patient's medical records and, further, that it was proper to limit the cross-examination of that expert regarding the study at issue. For the reasons set forth herein, we vacate the judgment of the Superior Court.

### Facts and Travel

On November 8, 2016, Judith Armour (Mrs. Armour or the decedent) arrived at South County Cardiology for a stress echocardiogram[1] (stress test) after she was referred by her primary-care physician, Dariusz Kostrzewa, M.D. (Dr. Kostrzewa). The defendants, Dr. Brandon and Dr. Bader, are the cardiologists at South County Hospital who supervised and interpreted the decedent's stress test. The results of Mrs. Armour's echocardiogram were "markedly abnormal" and indicated that she "may have significant coronary [artery] disease."[2] However, Mrs. Armour was sent

---

[1] A stress echocardiogram is a test that uses ultrasound imaging to show how well the heart muscle is working to pump blood throughout the body while exercising in a controlled setting. *Stress echocardiography*, MedlinePlus, https://medlineplus. gov/ency/article/007150.htm (last visited June 17, 2024).

[2] Coronary artery disease (CAD) is a narrowing or blockage of the coronary arteries, which supply oxygen-rich blood to the heart. *Coronary Artery Disease*, MedlinePlus, https://medlineplus.gov/coronaryarterydisease.html (last updated Nov. 1, 2016). Over time, plaque buildup in these arteries can limit how much blood can reach the heart muscle. *Id.* A consequence of CAD is an increased risk of a heart attack. *Id.*

home after South County Cardiology staff determined that she was medically stable. Tragically, the next day, Mrs. Armour died from a heart attack.

On the morning of the stress test, South County Cardiology nurses Joy Greene (Nurse Greene) and Margaret Cunnie (Nurse Cunnie) conducted a physical assessment of Mrs. Armour. The nurses determined that she was stable to undergo the stress echocardiogram; but they did not have access to her primary-care doctor's records when making this assessment. Nurse Greene testified that Mrs. Armour's stress test "only went a couple of minutes" before she became short of breath. She remained on the treadmill "for two minutes and ten seconds at 1.7 miles per hour at an incline of [ten] percent." In fact, the test was cut short before Mrs. Armour could complete the first stage of the Bruce protocol,[3] which would have been three minutes long. Nurse Greene and Nurse Cunnie agreed that Mrs. Armour's test was abnormal, which was relayed to the physician. Nurse Cunnie gave Mrs. Armour a dose of nitroglycerin,[4] and Nurse Greene noted that she had no chest pains or difficulty breathing. Mrs. Armour's peak heart rate was 136 compared to the baseline of 78.

---

[3] The Bruce protocol is the most common procedure used during treadmill exercise stress testing. *Treadmill Stress Testing*, National Library of Medicine, https://www.ncbi.nlm.nih.gov/books/NBK499903/ (last updated June 20, 2023). This protocol is divided into successive three-minute stages, "each requiring the patient to walk faster and at a steeper grade." *Id.*

[4] At trial, plaintiff's expert testified that nitroglycerin is a medication given to patients having anginal issues. He explained that "[i]t dilates the [blood] vessels that supply the heart in hopes to relieve * * * the potential mismatch of the oxygen * * * delivered to the heart tissue."

The nurses asked Dr. Brandon, the on-site cardiologist, to evaluate Mrs. Armour. After conferring with the physician, the decision was made to administer a second dose of nitroglycerin to Mrs. Armour. It took about seventeen minutes for her EKG levels to return to baseline.

That evening, Mrs. Armour returned home without any apparent difficulty. However, she drove the short distance to her neighbor's house that night because she was unable to physically walk across the yard, approximately 150 feet. Likewise, her husband testified that Mrs. Armour attempted to unload the dishwasher but could not do so because she did not have the strength to lift the dishes. The following morning, Mrs. Armour went for routine blood work. Later that day while on the phone with her husband, who was in Hawaii at the time, Mrs. Armour had difficulty speaking and collapsed. Mr. Armour contacted a neighbor to check on his wife, who was found unresponsive on the floor. Mrs. Armour was transported to South County Hospital, where she was pronounced dead.

The plaintiff filed a ten-count complaint in Washington County Superior Court, alleging medical negligence against defendants, Dr. Bader, Dr. Brandon, and South County Cardiology. In the complaint, plaintiff alleged that defendant cardiologists "negligently failed to perform and recommend timely, adequate, necessary and required follow up and treatment to * * * [the] decedent following the stress test," and that defendants were otherwise negligent in their treatment and care

of Mrs. Armour, which ultimately caused her death. A six-day jury trial was held in Washington County Superior Court. Over the course of the trial, the jurors heard testimony from various witnesses, including the nurses, the defendant-doctors, Mrs. Armour's family, and expert testimony from both sides regarding the applicable standard of care and causation.

At trial, Dr. Joseph Bouchard, a cardiologist affiliated with UMass Memorial and Marlborough Hospital, testified as plaintiff's expert. Doctor Bouchard is a board-certified cardiologist with over thirteen years of experience treating patients and interpreting stress echocardiograms as an attending physician. On a yearly basis, Dr. Bouchard estimated, he reviews anywhere between 150 and 200 stress tests. Doctor Bouchard reviewed Mrs. Armour's medical records, including the stress test, the nursing notes, the EKG and echocardiograph images, her primary-care physician's notes, and the autopsy report.

Based on his review of the records, Dr. Bouchard testified that Mrs. Armour was referred for a stress test by her primary-care physician because "she was having issues with shortness of breath and * * * [her doctor] wanted to see if * * * [a] coronary blockage could potentially be a factor." Doctor Bouchard agreed that the decedent's escalating shortness of breath was a reason to suspect coronary disease. The expert opined that Mrs. Armour had angina and other coronary risk factors, such as hypertension, hypercholesteremia, and high cholesterol. A patient with multiple

coronary risk factors, the doctor explained, is at risk of coronary disease. Likewise, "her EKG findings * * * raise[d] a suspicion for significant coronary disease." Doctor Bouchard testified that the changes in Mrs. Armour's EKG levels were concerning and the fact that it took over seventeen minutes for these changes to resolve was another "red-flag thing[] that we look for[,]" particularly when the patient had been administered two doses of nitroglycerin. The doctor further explained that "if [he] was looking at this EKG * * * [he] would be very concerned that the patient in front of [him] may have significant coronary disease." In addition, "the sizes of the ST depressions" were "markedly abnormal."

Doctor Bouchard opined that the procedure was "a very high-risk stress test" meaning that "the patient is at high risk for having significant coronary disease," and "that's the moment in time where [the doctors] had a chance to potentially intervene * * *." The plaintiff's expert explained that the standard of care in "a patient with a high-risk stress test that's unstable" required Dr. Brandon, the supervising physician on the date of Mrs. Armour's stress test, to send her to the emergency room. Thus, he opined that it was a breach of the standard of care to send her home after the test. The expert also explained that Dr. Bader, who was responsible for interpreting the results of the stress echocardiogram, had another chance to intervene and breached the standard of care by "not having the patient go to the emergency room." Doctor Bouchard opined that the failure of both Drs. Brandon and Bader was the cause of

Mrs. Armour's death and that "if Mrs. Armour went to the emergency room * * * she wouldn't have had that cardiac arrest the following day."

Doctors Brandon and Bader also gave testimony regarding the events on the date of Mrs. Armour's stress test. Doctor Brandon testified that, on the day in question, he remembered the decedent telling him that she had been experiencing shortness of breath for six months. He clarified that it would not have been his response to "have done a test on someone who had a significant change in her symptoms over a short period of time * * *." The doctor explained that Mrs. Armour had stable coronary artery disease for six months up until the date of her stress test and that she likely became unstable that evening. Doctor Brandon indicated that the fact that the decedent was unable to walk the short distance to her neighbor's house signaled that her stability had changed. He agreed that Mrs. Armour should have gone to the emergency room that evening, after her stress echocardiogram.

Despite her coronary risk factors, Dr. Brandon stated that his decision to send Mrs. Armour home that day "was based on her * * * having stable symptoms prior to the test and returning entirely to baseline in every way and being completely stable at the end of the test." He further explained that the decedent "did not meet any indications for being admitted to the hospital on an urgent basis * * *." Doctor Brandon stated that his "clinical impression was that she did have blocked arteries, she had stable coronary artery disease," which is a diagnosis made daily in their

office. Moreover, with other patients who have heart blockages, they are hospitalized only when their symptoms become unstable or they have a sudden cardiac arrest.

Doctor Brandon conceded that, on the date of her stress echocardiogram, he did not have access to Dr. Kostrzewa's records from Mrs. Armour's primary-care visit, only the actual referral. He explained that if the decedent had any known contraindications, the test would "[a]bsolutely not" have been performed. After the test, the plan was to have Dr. Bader interpret the results and to send Mrs. Armour home because she was stable, with "very good instructions * * * [on] what to do if there was a significant change in her symptoms * * *." Mrs. Armour was "referred * * * for a full consultation [at South County Cardiology]."

The defendants presented two expert witnesses at trial, Michael Cheezum, M.D. (Dr. Cheezum) and William Boden, M.D. (Dr. Boden). Doctor Cheezum works as a noninvasive cardiologist, "doing general cardiology practice, including inpatient and outpatient care and reading cardiac imaging." In his preparation for this case, Dr. Cheezum reviewed Mrs. Armour's medical records, her EKG tracings, and echocardiogram images. Over plaintiff's objection, Dr. Cheezum was permitted to testify that, if the decedent's primary-care physician had concerns about whether she was sufficiently stable to undergo the test, he would not have made the referral. Doctor Cheezum explained that the appropriate referral would be to an emergency

room, "[i]f the primary care provider was concerned for unstable symptoms, a change in symptoms, accelerating over a short period of time." Doctor Cheezum did not see any indication from Dr. Kostrzewa's records that gave reason to suspect unstable angina;[5] "to the contrary, there were comments that she had regular shortness of breath since the spring." Based on his review of the records, Mrs. Armour had been "in her usual state of health," with "stable symptoms dating back to [the] spring * * *."

Doctor Cheezum was also questioned regarding Dr. Kostrzewa's visit with the decedent on October 27, 2016, but plaintiff objected, arguing that "Dr. Brandon specifically testified he did not have Dr. Kostrzewa's record[s]" on the date of the stress test. The court overruled the objection, despite plaintiff's argument that defendants should not be allowed to question their expert about a record that neither doctor had access to at the time of the alleged negligence. Nevertheless, Dr. Cheezum opined that it was appropriate for the decedent to undergo the test because her angina was stable and that there was no reason to send Mrs. Armour to the emergency room that day. Doctor Cheezum testified that he was "certain" Dr. Brandon followed the appropriate standard of care. Likewise, Dr. Cheezum reviewed Dr. Bader's report completed after the stress test and concluded that the

---

[5] At trial, Dr. Cheezum explained that typical angina involves "chest discomfort, substernal chest discomfort, worse with exertion and relieved by rest or nitroglycerin."

physician had complied with the applicable standard of care, which did not require the decedent to be admitted for emergency treatment.

On cross-examination, plaintiff sought to question Dr. Cheezum regarding the Clinical Outcomes Utilizing Revascularization and Aggressive Drug Evaluation (COURAGE) study,[6] but defendants objected, maintaining that the line of questioning was outside the scope of direct examination. The trial justice sustained the objection and limited plaintiff's attorney from using the word "COURAGE" to describe the study.

Doctor Boden testified as defendant's causation expert. On direct examination, Dr. Boden testified that he is a board-certified cardiologist and that his current practice primarily comprises of research, with some clinical practice. After reviewing the decedent's records, Dr. Boden opined that he did not believe she had any cardinal findings of angina. He further testified that "there would have been no way for [Doctors] Brandon or Bader to have anticipated" that Mrs. Armour would suffer a sudden cardiac death a day later. As such, Dr. Boden opined to a reasonable

---

[6] The goal of the Clinical Outcomes Utilizing Revascularization and Aggressive Drug Evaluation (COURAGE) trial was to "evaluate the efficacy of percutaneous coronary intervention (PCI) compared with optimal medical therapy among patients with stable coronary artery disease." William E. Boden, M.D., F.A.C.C., *Clinical Outcomes Utilizing Revascularization and Aggressive Drug Evaluation – COURAGE*, American College of Cardiology Foundation, https://www.acc.org/ Latest-in-Cardiology/Clinical-Trials/2014/09/13/15/11/COURAGE (last updated October 31, 2018).

degree of medical certainty that there was nothing the defendant-doctors did or failed to do that caused injury or harm to the decedent or led to her sudden cardiac death.

After defendants rested their case, the parties reviewed the proposed jury instructions. The plaintiff requested the court to issue "an instruction as to other medical providers that would have said Dr. Bader, Dr. Brandon, and South County Cardiology are the only [d]efendants in this case." Specifically, plaintiff asked the trial justice to instruct the jury "to only consider the negligence of these parties and not speculate regarding any treatment and care received by [the decedent] from other medical providers[,]" and "[w]hether any physician not a party to this action was negligent or not is not relevant to * * * deliberations." The trial justice denied plaintiff's request, explaining that the "instructions, as prepared, list the [d]efendants, the three [d]efendants that are set forth here, and advises the jury that they are the ones that have had the action brought against them." After the jury instructions were given, plaintiff stated that he reserved the objections to the instructions previously raised.

The jury returned a verdict in favor of defendants on all counts. Judgment for defendants entered, and plaintiff filed a timely motion for a new trial. The plaintiff contended that he was entitled to a new trial because the jury's verdict was against the fair preponderance of the evidence. Specifically, he argued that the trial justice erred by (1) failing to instruct the jury that it would be improper to consider the

- 11 -

nonparty primary-care physician's conduct in assessing the negligence of Dr. Brandon and Dr. Bader; (2) admitting testimony and evidence as to whether Dr. Kostrzewa believed the decedent was sufficiently stable to undergo the stress test; and (3) prohibiting plaintiff from cross-examining defendants' standard-of-care expert regarding the COURAGE study. The defendants objected, maintaining that the plaintiff failed to show that the trial justice erred or that the jury's verdict was against the preponderance of the evidence.

In a bench decision, the trial justice denied plaintiff's motion for a new trial. With respect to plaintiff's claim that the jury should have been instructed pursuant to *Oliveira*, the trial justice found that the instruction "was not necessary for several reasons." First, she noted that *Oliveira* is readily distinguishable because here, the nonparty doctor's conduct took place "prior to the date of the alleged negligence of the doctors" and therefore, "the relationship between the nonparty physician and the [d]efendants is different from the relationship in *Oliveira*." The trial justice reasoned that the defendant-doctors collaborated with plaintiff's primary-care physician, unlike in *Oliveira*, where the nonparty doctor provided emergency care *after* the alleged negligence had already occurred. Thus, she found that it was "appropriate for the [d]efendants to present evidence and testimony concerning the treatment decisions of Dr. Kostrzewa, Nurse Cunnie, and Nurse Greene to ensure that the jury had a complete factual narrative." The trial justice further explained that Dr.

- 12 -

Kostrzewa's medical records for the decedent were admitted as a full exhibit without any objection from the parties, and that to preclude defendants from utilizing this evidence would "effectively sanitize the factual record * * *."

Regarding plaintiff's claim that it was improper to allow defendants' standard-of-care expert to rely on Dr. Kostrzewa's records, the trial justice explained that the records were used to support Dr. Cheezum's expert opinion and "not as evidence of the information available to [Doctors] Brandon and * * * Bader on [the date of the stress test]." Thus, she reasoned, "the testimony at issue was well within Dr. Cheezum's area of expertise because of his qualifications and the testimony of the [p]laintiff's own expert" and "Dr. Cheezum * * * was qualified to offer expert opinion regarding the propriety of referring patients for a stress test depending on the stability of the patient's heart."

And lastly, on plaintiff's claim that he should have been permitted to cross-examine Dr. Cheezum regarding the COURAGE study, the trial justice noted that defendants' expert did not offer any testimony regarding this study on direct examination and that plaintiff did not suffer any prejudice because he had "ample opportunity to elicit testimony regarding the COURAGE study from other witnesses * * *." After reviewing the testimony and evidence adduced at trial, the trial justice concluded that the overwhelming weight of the evidence supported the jury's verdict

and that she would not have reached a different conclusion.  Accordingly, she denied plaintiff's motion for a new trial.  Thereafter, plaintiff filed the within appeal.

## Standard of Review

"This Court's review of a trial justice's decision on a motion for a new trial is deferential." *Baker v. Women & Infants Hospital of Rhode Island*, 268 A.3d 1165, 1168 (R.I. 2022) (quoting *Patel v. Patel*, 252 A.3d 1221, 1229 (R.I. 2021)).  "When ruling on the motion, 'the trial justice sits as a super juror and is required to make an independent appraisal of the evidence in light of [the trial] justice's charge to the jury.'" *Id.* (quoting *Patel*, 252 A.3d at 1229).  "If the trial justice conducts the appropriate analysis and 'concludes that the evidence is evenly balanced or that reasonable minds could differ on the verdict, the justice should not disturb the jury's decision.'" *Id.* (quoting *Patel*, 252 A.3d at 1229).

"On appeal, a trial justice's decision on a motion for new trial will not be disturbed, assuming he or she performed the appropriate analysis, 'unless the party challenging that decision can show that the trial justice overlooked or misconceived material and relevant evidence or was otherwise clearly wrong.'" *Id.* (quoting *Patel*, 252 A.3d at 1229).  "However, with respect to a motion for a new trial on questions concerning an alleged error of law, our review is *de novo*." *Id.* (quoting *Patel*, 252 A.3d at 1229).

- 14 -

**Discussion**

Before this Court, plaintiff argues that the trial justice erred in denying his motion for a new trial. Specifically, Mr. Armour submits that he is entitled to a new trial because (1) the jury should have been instructed pursuant to our holding in *Oliveira*; (2) the trial justice erred in permitting defendants' standard-of-care expert to utilize the referring doctor's records as a basis for his opinions; and (3) it was an error to limit cross-examination of that expert regarding a particular study. We address each issue *seriatim*.

**Jury Instruction**

The plaintiff first challenges the trial justice's decision not to issue a jury instruction based on our holding in *Oliveira*. He argues that the jury in this case should have been instructed that "[w]hether or not any doctor not a party to this lawsuit was negligent or not is not relevant to your deliberations." *See Oliveira*, 846 A.2d at 825 n.1. The plaintiff contends that the need for a similar instruction is much greater in this case, given that Dr. Kostrzewa's actions "were even further removed than the actions of [the nonparty doctor] in *Oliveira*[,]" because Dr. Kostrzewa saw Mrs. Armour twelve days prior to her visit at South County Cardiology. (Emphasis omitted.) Although the trial justice reasoned that the facts of this dispute are distinguishable from *Oliveira*, plaintiff asserts that here the defendant-doctors did not collaborate with the nonparty doctor in the same manner as the doctors in

*Oliveira*. Moreover, he argues that the holding in *Oliveira* does not require that the nonparty doctor's conduct occur before or after the alleged negligence. As such, plaintiff submits that the trial justice's refusal to issue the instruction was prejudicial to his claim because Dr. Kostrzewa's records were admitted into evidence and "it would have been only natural for the jury to look at the conduct of Dr. Kostrzewa in assessing the negligence of * * * [d]efendants." Without the instruction, plaintiff submits he could not argue to the jury that it would be inappropriate to consider the decedent's primary-care doctor's conduct when assessing whether defendant-doctors acted negligently.

In response, defendants argue that the trial justice was correct to refuse an instruction based on *Oliveira* because that case is "easily distinguishable from the instant case and its holding is inapposite." First, defendants point out that the relationship between the defendant-doctors and the nonparty doctor in this case is much different from the relationship in *Oliveira*. Notably, defendants argue that in this case, Dr. Kostrzewa treated Mrs. Armour prior to the defendant-doctors, while in *Oliveira*, the nonparty doctor provided emergency care to the patient *after* the *Oliveira* defendants' negligence took place. The defendants insist that plaintiff overlooks the fact that since "Dr. Kostrzewa ordered the exercise stress test * * * [he] believed that the patient was stable and could undergo the test," whereas in *Oliveira* it would have been impossible for the nonparty doctor's conduct to inform

- 16 -

the defendant-doctors' decision-making process because it occurred *after* the alleged negligence. Thus, defendants argue that in *Oliveira* the nonparty doctor's actions were not relevant to the standard of care, whereas here, Dr. Kostrzewa's records were relevant as to Mrs. Armour's stability on the date of her stress test, and the records from her visit were admitted into evidence, with nearly every witness at trial offering testimony about the records.

"Our review of jury instructions is *de novo*." *Mangiarelli v. Town of Johnston*, 289 A.3d 560, 566 (R.I. 2023) (quoting *Yangambi v. Providence School Board*, 162 A.3d 1205, 1216 (R.I. 2017)). "[T]his Court examines jury instructions in their entirety to ascertain the manner in which a jury of ordinarily intelligent lay people would have understood them." *Id.* (quoting *Riley v. Stone*, 900 A.2d 1087, 1092 (R.I. 2006)). "A charge need only adequately cover the law." *Id.* (brackets omitted) (quoting *Yangambi*, 162 A.3d at 1217). "We do not examine single sentences or selective parts of the charge; rather, the challenged portions must be examined in the context in which they were rendered." *Id.* (quoting *Riley*, 900 A.2d at 1092-93).

In *Oliveira*, we explained that the trial justice properly narrowed the jury's focus to the issue of the defendant-doctors' negligence. *Oliveira*, 846 A.2d at 827. The plaintiffs' claims in *Oliveira* concerned the defendant-doctors' failure to timely perform a cesarean section. *Id.* at 824. The plaintiffs argued that the standard of care required defendants to deliver the infant by cesarean section, and the additional delay

- 17 -

caused by the defendant-doctors' attempts to deliver the infant vaginally was the proximate cause of the infant's death by asphyxiation. *Id.* After several unsuccessful attempts, the defendant-doctors sought the assistance of another attending physician at the hospital. *Id.* at 824-25. The *Oliveira* defendants sought to use the nonparty doctor's conduct to argue that they did not act negligently in providing the same treatment. *Id.* at 825-26. We rejected that argument and found defendants' reasoning "untenable." *Id.* at 826. While physicians are held to the duty of care expected of a reasonably competent practitioner acting under similar circumstances, the defendant-doctors in *Oliveira* were not operating under similar circumstances as the nonparty doctor, who provided emergency care after the alleged negligence had already occurred. *Id.* (citing *Sheeley v. Memorial Hospital*, 710 A.2d 161, 167 (R.I. 1998)). Critically, we explained that "[t]he difference in time, place and skill level distinguish the level of care provided by [defendants and the nonparty doctor] so that the trial justice's instruction to the jury was correct and warranted." *Id.* at 826.

In this case, the primary-care physician's actions were even further removed than the actions of the nonparty doctor in *Oliveira*, which warranted an instruction to the jury that it should not consider the negligence of any nonparty doctors when determining if the defendant-doctors were liable. It is well settled that "we hold physicians to a duty of care that is expected of a reasonably competent practitioner *acting under similar circumstances*." *Gianquitti v. Atwood Medical Associates, Ltd.*,

973 A.2d 580, 595 (R.I. 2009) (quoting *Oliveira*, 846 A.2d at 826). Accordingly, it was improper for the defendant-doctors to rely on a nonparty doctor's conduct to support their standard-of-care defense because the decedent's primary-care physician was operating under different circumstances. *See id.* Dr. Kostrzewa saw Mrs. Armour twelve days prior to her visit at South County Cardiology. The decedent's primary-care physician referred her to the defendant-doctors relying on their expertise as cardiologists. A core issue in this case was whether or not the decedent was stable on the date of her stress echocardiogram. At trial, defendants attempted to draw the inference that Dr. Kostrzewa's records and conduct were germane to the assessment of their alleged negligence in treating Mrs. Armour, even though defendants did not have the records or speak with the decedent's primary-care physician prior to the test. Indeed, defendants introduced evidence and elicited testimony that suggested the decedent was stable because her primary-care physician referred her for the test. This was a misplaced attempt to bolster their defense, without presenting any evidence or testimony as to the applicable standard of care for a primary-care physician acting under similar circumstances. *See Gianquitti*, 973 A.2d at 596 (explaining that plaintiffs failed to present expert testimony as to standard of care for interns operating under different circumstances from defendant-physicians and had duties different from those of other physicians, and concluding that testimony of physicians did not support an instruction on standard of care for

interns); *Oliveira*, 846 A.2d at 826 (holding that defendants could not rely on standard of care of nondefendant doctor to establish standard of care applicable to defendant-doctors because they did not operate under similar circumstances).

After a careful review of the record, we conclude that failing to instruct the jury that it would be improper to consider the nonparty referring physician's conduct in assessing defendants' negligence was unduly prejudicial and constitutes reversible error.

### Defendants' Standard-of-Care Expert

Next, plaintiff submits that the trial justice erred by permitting defendants' standard-of-care expert, Dr. Cheezum, to rely on Dr. Kostrzewa's medical records as a basis for his opinions. Over plaintiff's objections, Dr. Cheezum made "speculative assumptions" about Dr. Kostrzewa's thoughts during the visit and the stability of Mrs. Armour on the date of the alleged negligence, and improperly relied on his records, which defendants did not possess when assessing the patient's condition.

The defendants argue that plaintiff failed to object to Dr. Cheezum's testimony regarding the decedent's prior medical history at trial and that the trial justice did not abuse her discretion because Dr. Cheezum's testimony was based on medical records admitted into evidence and his education, training, and experience. Indeed, they maintain that Mrs. Armour's medical stability was the central issue

relating to standard of care, and Dr. Cheezum's testimony directly addressed whether, in his expert opinion, Mrs. Armour was medically stable. Thus, defendants contend that the trial justice did not abuse her discretion by allowing Dr. Cheezum's testimony on this point.

"[T]he determination of admissibility of an expert witness's testimony rests within the sound discretion of the trial justice." *Kurczy v. St. Joseph Veterans Association, Inc.*, 820 A.2d 929, 939 (R.I. 2003) (quoting *Rodriquez v. Kennedy*, 706 A.2d 922, 923 (R.I. 1998)). "A trial justice's ruling on the admissibility of expert testimony will not be overturned by this Court" unless it concludes that "the ruling constituted an abuse of discretion." *Id.* at 939-40.

When deciding whether to admit expert testimony, "the trial justice must evaluate whether the testimony that a party seeks to present to the jury is 'relevant, within the witness's expertise, and based on an adequate factual foundation.'" *Kurczy*, 820 A.2d at 940 (emphasis omitted) (quoting *Rodriquez*, 706 A.2d at 924). "Such an evaluation is necessary to ensure that the proffered expert testimony is 'relevant, appropriate, and of assistance to the jury,' and thus admissible." *Id.* (quoting *DiPetrillo v. Dow Chemical Co.*, 729 A.2d 677, 686 (R.I. 1999)). "To be admissible, 'an expert's opinion must be predicated upon facts legally sufficient to form a basis for his conclusion.'" *Id.* (quoting *Raimbeault v. Takeuchi Manufacturing (U.S.), Ltd.*, 772 A.2d 1056, 1062 (R.I. 2001)).

- 21 -

The defendants' standard-of-care expert was permitted to testify regarding the decedent's primary-care doctor's records, despite the fact that these records were not available to defendants on the date of her stress test. Although admitted into evidence as a full exhibit, the records were relevant for purposes of causation. The defendants' attempt to utilize these records to support their standard-of-care defense was misplaced. We have held that an expert witness must base their opinion "upon facts legally sufficient to form a basis for his conclusion." *Kurczy*, 820 A.2d at 940 (quoting *Raimbeault*, 772 A.2d at 1062). We conclude that it was an error to allow the expert to use the decedent's primary-care provider's records to support his opinions as defendants did not have access to this information when determining if she was stable. *See Gianquitti*, 973 A.2d at 596 (explaining that "expert witness must have 'knowledge, skill, training, or experience in the same field as the alleged malpractice so that the expert's testimony can be genuinely helpful to the jury'") (quoting *Debar v. Women and Infants Hospital*, 762 A.2d 1182, 1188 (R.I. 2000)). Here, to allow the expert cardiologist's testimony utilizing the specific content of the referring physician's records, a primary-care provider, to support the defendant-cardiologists' actions on the date of her stress test, when they were admittedly not available to defendants, was an abuse of discretion. *See id.*

**Cross-Examination of Dr. Cheezum**

Lastly, plaintiff challenges the trial justice's decision to preclude him from cross-examining defendant's standard-of-care expert, Dr. Cheezum, regarding the COURAGE study. The plaintiff sought to cross-examine the expert regarding his deposition testimony where he stated that the COURAGE study admitted only stable patients and that Mrs. Armour's stress echocardiogram results, which were markedly abnormal, would have excluded her from the study. As such, plaintiff contends that the trial justice erred in precluding his cross-examination on this point, and that preventing counsel from using the word "COURAGE" to describe the study was highly prejudicial, warranting a new trial.

The defendants maintain that the trial justice's ruling was correct as it is well settled in this jurisdiction that "cross-examination of a witness is generally limited in scope to matters testified to on direct examination." *State v. Benevides*, 420 A.2d 65, 69 (R.I. 1980). Therefore, defendants insist that the trial justice properly excluded the evidence because "Dr. Cheezum did not testify about the COURAGE study on direct examination, [thus] the [c]ourt properly ruled that asking him questions about the study on cross-examination would be beyond the scope."

We review a trial justice's decision "to limit the scope of cross-examination * * * for clear abuse of discretion; the decision will be overruled only if such abuse constitutes prejudicial error." *State v. Chadha*, 253 A.3d 372, 379 (R.I. 2021)

(quoting *State v. Rivera*, 987 A.2d 887, 906 (R.I. 2010)). In relevant part, Rule 611(b) of the Rhode Island Rules of Evidence provides that "[c]ross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness." R.I. R. Evid. 611(b). Indeed, this Court has held that "the subject matter of a witness's cross-examination should ordinarily not exceed the scope of the witness's direct examination." *State v. Motyka*, 893 A.2d 267, 284 (R.I. 2006); *State v. Gordon*, 880 A.2d 825, 838 (R.I. 2005) ("[C]ross-examination is generally limited to the scope of direct examination * * *."); *State v. Wright*, 817 A.2d 600, 610 (R.I. 2003) (holding that, during the cross-examination of a witness, "[i]nquiries * * * that exceed the scope of the direct examination are objectionable").

While "[i]t is axiomatic that cross-examination is generally limited to the scope of the direct examination," in limited circumstances we have held that "questions calculated to explain, contradict, or discredit a witness's testimony or designed to test the witness's accuracy, memory, veracity, credibility, or bias" are permissible. *State v. Mercurio*, 89 A.3d 813, 819 (R.I. 2014) (brackets omitted); *see also Gordon*, 880 A.2d at 838-39 (holding that state could exceed the scope of a defendant's direct testimony on cross-examination to rebut his purported alibi).

The defendants elected not to question Dr. Cheezum regarding the COURAGE study on direct examination, which involved only stable patients. As

- 24 -

part of Dr. Cheezum's pretrial expert disclosure, he cited the COURAGE study to support his opinion that "patients like Mrs. Armour may not have had an improved clinical outcome if she had an invasive intervention." During the doctor's pretrial deposition, he admitted that Mrs. Armour's stress echocardiogram results would have excluded her from the COURAGE study. He explained, "[o]ne of the exclusion criteria was a markedly positive stress test in Stage 1. [Mrs. Armour] had a positive, markedly positive stress test in Stage 1." The standard of care required patients with abnormal stress test results to be taken out of the trial and "revascularize[d]." Thus, plaintiff insists that precluding cross-examination on this point was highly prejudicial and warrants a new trial. We agree.

The trial justice's ruling prevented the plaintiff from mentioning the COURAGE study by name. Doctor Cheezum testified that he could not respond to certain questions about studies unless he was made aware of the particular study being referenced. This ruling was unduly prejudicial because the plaintiff sought to contradict Dr. Cheezum's testimony that Mrs. Armour was stable on the date of her stress test. *See Chadha*, 253 A.3d at 379. The plaintiff sought to elicit testimony that the COURAGE study supported his standard-of-care argument that the decedent was unstable on the date of her echocardiogram and needed to be revascularized. Although outside the scope of direct examination, the plaintiff should have been permitted to elicit testimony to explain that the COURAGE study did not admit

- 25 -

unstable patients, thus excluding the decedent. *See Gordon*, 880 A.2d at 838. This went to the heart of the most important standard-of-care issue in the case, whether Mrs. Armour was stable on the date of the alleged negligence. As such, we conclude it was an abuse of discretion to limit cross-examination on this point and to prevent the plaintiff from referencing the study by name, as it would have tended to contradict Dr. Cheezum's testimony that the patient was stable on the date of her echocardiogram. *See Chadha*, 253 A.3d at 379; *Gordon*, 880 A.2d at 838.

## Conclusion

For the foregoing reasons, the judgment of the Superior Court is vacated. The papers of the case are remanded to the Superior Court for a new trial.



## STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | John Armour, Individually and as Personal Representative of the Estate of Judith Armour v. David Bader, M.D., et al. |
| **Case Number** | No. 2023-5-Appeal.<br>(WC 18-344) |
| **Date Opinion Filed** | June 28, 2024 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Erin Lynch Prata |
| **Source of Appeal** | Washington County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Sarah Taft-Carter |
| **Attorney(s) on Appeal** | For Plaintiff:<br><br>Mark S. Mandell, Esq. |
| | For Defendants:<br><br>Judah H. Rome, Esq.<br>Christine Anne Stowell, Esq. |